# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

NOEL N. CHUA, M.D.,                  )
                                     )
     Plaintiff,                 )
                                     )
v.                                   )          CIVIL ACTION FILE
                                     )
ANDREW J. EKONOMOU;                  )          NO. _____
MICHAEL G. LAMBROS; LAMBROS          )
ATKINSON & EKONOMOU, P.C.; THE       )
LAMBROS FIRM, LLC, and               )
STEVE BERRY,                         )
                                     )
     Defendants.                )

## <u>COMPLAINT</u>

Plaintiff Noel N. Chua, M.D., files this Complaint against the Defendants

Andrew J. Ekonomou ("Ekonomou"), Michael G. Lambros ("Lambros"), and their

law firms Ekonomou Atkinson Lambros, P.C. ("EAL Firm") and The Lambros

Firm, LLC ("Lambros Firm"), pursuant to the Federal Racketeer Influenced and

Corrupt Organizations Act ("Federal RICO"), 18 U.S.C. §§ 1961 *et seq.*, and the

Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO"),

O.C.G.A. §§ 16-14-1 *et seq.*; and against Defendants Ekonomou, Lambros, the EAL

Firm, The Lambros Firm, and Steve Berry ("Berry"), pursuant to 42 U.S.C. §§ 1985

and 1988, respectfully showing the Court as follows:

**INTRODUCTION**

1.      This Complaint is based on the systematic deprivation of the civil rights of Plaintiff Noel N. Chua, M.D. ("Dr. Chua"). The "Making a Murderer" Enterprise ("Murderer Enterprise") consisting of Stephen Kelley, then-DA of the Brunswick Judicial Circuit ("DA Kelley"), his then-Assistant Jackie Johnson ("ADA Johnson"), then-Superior Court Judge Amanda F. Williams ("Williams"), Defendant Lambros, Defendant Ekonomou (acting as both private attorney and prosecutor), Defendant EAL Firm, Defendant Lambros Firm, Defendant Stephen Berry ("Berry") and others, were successful in having Dr. Chua indicted, arrested, incarcerated, and convicted for felony murder, and in stripping him of approximately two million dollars ($2,000,000.00) of assets.

2.      The nineteen-count indictment against Dr. Chua contained sixteen separate counts of violating the Georgia Controlled Substances Act ("VGCSA") by prescribing controlled substances to Carter between September 22 and December 15, 2005, allegedly unlawful because they were not in the ordinary course of treatment; one count of VGCSA for keeping a dwelling place for the purpose of using controlled substances ("dwelling place"); and two counts of felony murder of Carter based on the underlying felony VGCSA's.  The Murderer Enterprise's theory of felony murder was that Dr. Chua had prescribed several controlled substances to Carter that were unlawful based on an alleged romantic relationship

between the two, and that Carter died in Dr. Chua's house during the commission of these felony VGCSA's.  The theory was one of first impression in Georgia.  Dr. Chua was convicted of        VGCSA counts and of felony murder.  On appeal, the Georgia Supreme Court affirmed all but one count, the "dwelling place" VGCSA, for which the Court concluded that the prosecution produced no evidence.

3.     The Murderer Enterprise further ensured its goal of making Dr. Chua a murderer   by wrongfully pursuing an unlawful *in personam* Georgia RICO forfeiture action against Dr. Chua and his medical practice.  On the day Dr. Chua was arrested and indicted, Judge Williams, in response to a Complaint filed by D.A. Kelley, ordered that *all* of Dr. Chua's assets be seized, that Dr. Chua be denied access to them, and that Defendant Lambros as "Receiver" take charge of them.  In the first year alone, the EAL firm was enriched by nearly $100,000 and, by 2015, only $14,274.01 remained of Dr. Chua's property.  Judge Williams ignored Chua's August 2007 motion to dissolve the receivership, and there was *never* any evidentiary hearing on *any* aspect of the RICO forfeiture action, other than the Receiver's requests for compensation and liquidation.  Despite Dr. Chua's efforts to have his defense counsel, Attorney Don Samuel ("Attorney Samuel"), and defense experts paid from the receivership funds, only $30,000.00 was actually provided for his defense.  Dr. Chua's assets were depleted due to the mismanagement, theft and false reporting of Defendant Lambros as Receiver of

the Estate;  Defendant Ekonomou, his law partner, as Counsel to the Receiver; and the EAL Firm from which they operated, which received the full cooperation and support of the other members of the Murderer Enterprise, particularly  DA Kelley, ADA Johnson, Judge Williams, Ekonomou, Lambros, the EAL Firm, the Lambros Firm, Superior Court Judge Anthony D. Harrison ("Judge Harrison") and others. The RICO forfeiture unconstitutionally deprived Dr. Chua of his assets and prevented him from mounting an appropriate defense to the charges.

4.      The Murderer Enterprise did not end its efforts in 2015.  Following the filing of a habeas corpus petition by Dr. Chua in 2013, *Chua v. Holt,* Civ. Act. No. 13-CV-59673 (Superior Court, Bibb County), Dr. Chua's habeas counsel, Stephen Reba ("Attorney Reba") discovered an unsigned memo in the Brunswick DA's files, which advised DA Kelley regarding jury selection for Dr. Chua's murder trial, and warned against, among other things, "putting blacks on the jury".  The memo instructed the reader to contact the author at the telephone number of Defendant Steve Berry's Camden County Commission Office.  In December 2013, Attorney Reba made an Open Records Request for the "Berry memo," which was denied by then-DA Johnson on the grounds that the memo was "attorney work product". On May 7, 2014, Attorney Reba filed a lawsuit pursuant to the Open Records Act, seeking disclosure of the Berry memo.  Ekonomou, then an ADA in Brunswick Judicial Circuit, was attorney of record for the DA's office.  ADA Ekonomou

wrongfully accused Attorney Reba of planting the Berry memo in the DA's file, and vigorously defended the DA's office's claim that the memo was attorney work product.  The trial judge, senior Judge J. Richard Porter who was appointed after the all the judges in the Brunswick Judicial Circuit recused themselves, ruled that the Berry memo was not subject to disclosure.   The Court of Appeals reversed, directing that the trial court hold an evidentiary hearing on the Berry memo.  After Attorney Reba moved to disqualify ADA Ekonomou, DA Johnson and the DA's office, ADA Ekonomou offered to produce the Berry memo.  Attorney Reba did not receive the memo until March 2017, over two and a half years after requesting it.

5.    Hon. Verda Colvin ("Judge Colvin") presided in the habeas case, and scheduled a hearing for August 8, 2017.  Berry was served with a subpoena, but announced a few days before the hearing that he would not appear.  Judge Colvin heard testimony from Attorney Samuel, DA Johnson and ADA Ekonomou, among others, and stated that Berry would be subpoenaed again and required to appear. A few weeks after the hearing, Defendant Lambros approached first, Attorney Samuel and then Attorney Reba with an offer of an unethical "global settlement" of the criminal and RICO cases.  Pursuant to a plea and settlement agreement (drafted entirely by members of the Murderer Enterprise) dated September 18, 2017, Judge Harrison granted Dr. Chua's one-sentence extraordinary motion for

new trial; Dr. Chua pleaded guilty to involuntary manslaughter (with a maximum ten-year sentence) and to the "dwelling place" VGCSA which, according to the Georgia Supreme Court had "no factual basis", but carried a one-year maximum sentence; Judge Harrison sentenced Dr. Chua to eleven years imprisonment, with credit for the eleven years he had been incarcerated; and Chua settled the RICO forfeiture action with the State for the amount of his assets left in the Camden Court Registry.  Dr. Chua was released on September 18, 2017.  He received what was left of his assets, only $14,274.01, from the Camden County Clerk on September 20, 2017, at which time the alleged conspiracy to make Dr. Chua a murderer terminated.

6.     Dr. Chua brings this action to seek compensation for the conspiracy that deprived him of his liberty, his property, and his civil rights.

## PARTIES AND RELEVANT NON-PARTIES

**Plaintiff**

7.     Plaintiff Noel N. Chua, M.D. is an individual and citizen of the United States, currently residing in Los Angeles, California.   A consistent academic scholar, Dr. Noel Chua earned his Bachelor of Science in Medical Technology and Doctor of Medicine degrees from Far Eastern University in Manila, Philippines.  He placed first and eleventh in the national government licensure exams for medical technologists and physicians, respectively. In 1994, after serving

6

for six months as a missionary doctor in a remote island stretch in the Philippines, Dr. Chua joined the internal medicine residency program at Western Pennsylvania Hospital in Pittsburgh.  Immediately after residency he was employed by Ellwood Medical Group in nearby Ellwood City, Pennsylvania, where he developed a successful practice.  Dr. Chua earned his Master of Science in Health Care Policy and Management from Carnegie Mellon University with highest distinction in 2000.  He practiced medicine as Noel N. Chua, M.D., P.C. in St. Marys, Georgia from 2001 until his arrest in 2006.

**Defendants**

8.     Defendant Andrew J. Ekonomou is an individual residing in Atlanta, Georgia.  He is a licensed attorney in Georgia, and was, at all times material herein, engaged in private practice in the Atlanta, Georgia metropolitan area, in various associations with Defendant Michael G. Lambros, his brother-in-law.  Ekonomou represented John Duncan Fordham, brother of then-judge Amanda Williams in a federal criminal prosecution in 2005; a year later, his partner Michael Lambros was appointed Receiver in the RICO forfeiture action against Dr. Chua.  Ekonomou held himself out as counsel for the Receiver, and took an active role in the depletion of Dr. Chua's assets.  Since 2010, Ekonomou has also served as an Assistant District Attorney to now-DA Jackie Johnson in the Brunswick Judicial Circuit, in violation of O.C.G.A. § 15-18-21(a).  Ekonomou has served as a Special

Assistant District Attorney for various District Attorneys in the State of Georgia, primarily pursuing State RICO forfeiture claims. *See, e.g., Amusement Sales, Inc. v. State,* 316 Ga. App. 727 (2012).

9.    Defendant Michael G. Lambros is an individual residing in metropolitan Atlanta, Georgia.  Lambros is a licensed Georgia attorney who has a private practice in metropolitan Atlanta, Georgia.  At all times material herein, Lambros practiced law with Ekonomou, who is married to Lambros' sister.  As part of his regular practice of law, Lambros has also served as a Special Assistant District Attorney for various District Attorneys in the State of Georgia, pursuing State RICO forfeiture claims. *See, e.g., Amusement Sales, Inc. v. State,* 316 Ga. App. 727 (2012).  Lambros has also been appointed a receiver in State RICO forfeiture suits around the State of Georgia, including another one brought by the Brunswick DA in Camden County, Georgia, in 2008. *See, e.g., Cisco v. State,* 285 Ga. 656 (2009) (use of *in personam* RICO forfeiture suits unconstitutional without safeguards of criminal procedure).

10.    Ekonomou's and Lambros' fee arrangements with another Georgia district attorney regarding a similar RICO forfeiture was disapproved by the Georgia Supreme Court in *Amusement Sales, Inc. v. Georgia,* 316 Ga. App. 727, 728 (2012), because Ekonomou and Lambros had "a personal financial stake in the outcome of the proceedings."

11.     Ekonomou Atkinson & Lambros, LLC ("EAL Firm") was the law firm with which Ekonomou and Lambros practiced from 2006 until sometime in 2010.  The EAL Firm billed and was paid from Dr. Chua's receivership estate from 2006 to 2010.

12.     The Lambros Firm, LLC ("Lambros Firm") is the successor to the EAL Firm.  The Lambros Firm billed and was paid from Dr. Chua's receivership estate from 2010 to 2015.

13.     Steve Berry is a former Georgia licensed attorney engaged in private practice in St. Marys Georgia from 1980 until 2010, and served as a Camden County Commissioner from 1996 until 2010.   Berry is an internationally known bestselling author of fiction, currently residing in St. Augustine, Florida.

14.     Certain other non-party individuals played roles, directly or indirectly, in the RICO conspiracy.  Foremost among the Non-Party RICO Co-Conspirators are the following:

  a.  Hon. Stephen D. Kelley, District Attorney for the Brunswick Judicial Circuit from 1997 until 2010, and currently Superior Court Judge in the Brunswick Judicial Circuit;

  b.  Hon. Jackie L. Johnson, Assistant District Attorney for the Brunswick Judicial Circuit from 1998 until 2010, and currently District Attorney for the Brunswick Judicial Circuit;

9

c.   Amanda F. Williams, Superior Court Judge for the Brunswick Judicial Circuit from 1991 until 2011.  Pursuant to a Standing Order in Camden County Superior Court, all cases in which the defendant was charged with a felony violation of the Georgia Controlled Substances Act ("GCSA") were assigned to Judge Williams, who presided over the Drug Court in Camden County.  Judge Williams resigned from the bench in 2011, after being charged with several counts of judicial misconduct by the Georgia Judicial Qualifications Commission.  She is currently in private practice in Brunswick;

d.   Hon. Anthony D. Harrison, Superior Court Judge for the Brunswick Judicial Circuit since 2009;

e.   Unknown members of the St. Marys Police Department; and

f.   Nancy Bailey, friend of Dr. Chua who cooperated with the Murderer Enterprise and was paid by Dr. Chua's receivership estate.

15.   This Court has subject-matter jurisdiction over Dr. Chua's claims pursuant to 28 U.S.C. §§ 1331 and 1367 because (a) some of the claims in this action arise under the Federal RICO statute, 18 U.S.C. §§ 1961 *et seq.*, and under 42 U.S.C. §§ 1985 and 1988; and (b) the remaining claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10

16.   This Court has personal jurisdiction over Defendants pursuant to both 18 U.S.C. § 1965 and Georgia's long-arm statute, O.C.G.A. § 9-10-91.  All of the events giving rise to this cause of action took place in the State of Georgia.

17.   Venue is proper in this Court pursuant to 28 U.S.C. 1391(b)(3) because Defendants Ekonomou and Lambros are residents of the District and subject to the Court's personal jurisdiction.

## FACTS SUPPORTING CLAIMS

**Dr. Chua's Medical Practice in St. Marys, Georgia**

18.   In 2000, Dr. Chua was given a financial incentive by then-Camden Medical Center to open a solo primary care practice in St Marys, Georgia.  In 2001, he became duly licensed to practice medicine in Georgia, and moved to St. Marys. Dr. Chua's practice, operating as Noel N. Chua, M.D., P.C., grew from two patients to over 1,000 patients in the first year.  Dr. Chua was well-respected in Camden County; he served on various committees of the Camden hospital and held free clinics for indigent patients throughout his time there. At the time of his arrest, Dr. Chua's practice had some 3,000 patients, and his annual income from the practice was approximately $300,000.  By that time, Chua owned the medical building at 125 A/B Andrews Way, St. Marys, Georgia ("Andrews"); he conducted his practice from 125A, and rented 125B to another physician.

19.     Dr. Chua resided in St. Marys until his arrest in 2006 at the home he owned in the gated community of Osprey Cove, 1022 Greenwillow Drive, St. Marys, Georgia ("Greenwillow").  The Greenwillow house was a one-story, nearly 3,000 square foot waterfront home with a pool and four bedroom suites.

20.     Dr. Chua received regular rental income totaling approximately $5,500/month from the other office in Andrews, and four residential rental properties in Camden County:  a single-family home at 124 Huntington Drive ("Huntington"); a duplex at 175-A/B Lakemont Drive; a single-family home at 806 Mission Trace Drive ("806 Mission Trace"); and a single-family home at 812 Mission Trace Drive ("812 Mission Drive"). The estimated 2006 value of Dr. Chua's real estate was approximately $1.55 million dollars ($1,500,000.00).

**James L. Carter III and Dr. Chua**

21.     In September of 2005, Dr. Chua met James B. Carter III ("Carter"), who was at the time a pre-med student at the College of Coastal Georgia at its Camden County campus. Carter had been referred to Dr. Chua by the biology lab coordinator, a patient of Dr. Chua's, who suggested that Carter ask if he could "shadow" Dr. Chua.

22.     Carter's parents were divorced; both had remarried.  Carter for the most part lived with his mother, a nurse at the hospital in Camden County, at her home in Brantley County, some 25 miles from his college campus.  Carter also frequently

stayed at his father's home in Ware County. Carter's maternal grandfather was Clyde Aldridge, a successful Camden County businessman who was active in the Republican Party of Camden County and local politics.

23.    Carter's first request was to "shadow" Dr. Chua, and learn more about his medical practice, to which Dr. Chua agreed.  Carter began working in Dr. Chua's office on Andrews and accompanied him on hospital rounds and other activities.

24.    Carter also became a patient of Dr. Chua on September 22, 2005.  In his patient registration form, he gave a Waycross address, and stated he was employed by Clyde Aldridge Insurance.  He complained of severe and debilitating headaches and stabbing epigastric pains, and reported that he was taking Klonopin and aspirin.  Dr, Chua prescribed a trial of hydrocodone, and warned Carter about the potential for abuse.  He also recommended that Carter stop taking aspirin and other NSAID pain relievers and work on his diet.

25.    Dr. Chua immediately sent for Carter's medical records which showed that Carter  had been treated for these headaches for several years by a number of physicians in Camden and the surrounding counties, with little success.  Part of the treatments had included prescriptions for various controlled substances, including opioids.

26.    Dr. Chua followed a regular course of treatment of Carter's headaches: He began with a prescription for Imitrex, a non-narcotic designed to prevent

migraines, and when Carter's symptoms continued, prescribing gradually stronger pain medication, including opioids.  He examined Carter frequently (at least eight times between September 22 and December 15, 2005) and, when the various drugs he prescribed did not relieve Carter's pain, he would cancel and collect one prescription and prescribe another.   Medical experts have opined that Dr. Chua's course of treatment with a progression of pain medications was "appropriate and almost cautions" and was rational in light of his duties both to relieve pain and to do no harm.  A local physician who reviewed Carter's medical records, provided an affidavit to DA Kelley in which he opined that Dr. Chua acted within his sphere of medical knowledge by prescribing controlled substances for the purpose of controlling and treating Carter's headaches.

27.    Unbeknown to Dr. Chua, Carter was prescribed other controlled substances, including opioids, by other local physicians, and was "stockpiling" these narcotics. Carter also had possession of controlled substances, including opioids, that were not prescribed for him.

28.    Several weeks after Carter began shadowing Dr. Chua, Carter advised that his father had "kicked him out" of his home. It was arranged that Carter would live in Dr. Chua's house in St. Marys, Georgia, so that he would not have to take the 50-mile round trip to attend classes and to work in Dr. Chua's practice.

29.    From October 2005 until his death in December 2005, Carter resided in a self-contained suite in Dr. Chua's home on Greenwillow.  Dr. Chua lived in another suite, with various family members constantly coming and going.  One female cousin from the Hong Kong visited Dr. Chua for the month of November. When she and Dr. Chua were planning a trip to New York City, Carter asked to accompany them, and Chua agreed.

30.    Carter was also being treated by Dr. David J. Faulk, a Brunswick physician specializing in neurology and psychiatry, during the fall of 2005. Carter reported migraines, insomnia and depression throughout the fall, and spoke of a breakup with his girlfriend.   Unbeknown to Dr. Chua, Carter also reported that he sometimes used drugs for recreational purposes, that his parents were monitoring his use, and that his stepmother had given him pain pills.

31.    Carter's pain was so severe that he was frequently hospitalized, both before and during his treatment by Dr. Chua.  Dr. Chua had him hospitalized on November 17, 2005, and again on December 8, 2005, for severe headaches.  On both occasions, Carter spent one night in the hospital where he was given intravenous pain medication.

32.    After his discharge on December 9, 2005, Carter reported to Dr. Chua that his headaches were not relieved by a Fentanyl patch, Klonopin, or Robaxin, and he returned all these medications to Dr. Chua.  Dr. Chua prescribed methadone

15

for the headaches, and directed Carter to report if he had no relief or if the pain worsened.

33.     On the morning of December 15, 2005, Carter appeared at Dr. Chua's office in an agitated state.  When Dr. Chua upbraided him for his attitude and suggested that he go home, Carter angrily informed Dr. Chua that he was moving back to his home in Brantley County.  Without any knowledge of Carter's cache of narcotics and other drugs, Dr. Chua agreed with his decision, followed Carter to his home, and then returned to his office.

34.     When Dr. Chua returned home that evening, he found Carter dead on the bathroom floor of his downstairs suite, an apparent suicide by drug overdose.

35.     Dr. Chua made a 911 call, and officers of the St. Marys Police Department ("SMPD") responded.  Photographs taken by SMPD officers showed a syringe near Carter's body (suggesting that he had injected himself), as well as bottles containing controlled substances prescribed to Carter by other physicians, drugs prescribed for other individuals, unidentified drugs in unmarked pill containers, and some controlled substances that had been duly prescribed by Dr. Chua in his treatment of Carter.  There were also samples of non-narcotic prescription drugs, including medications for high blood pressure, high cholesterol, and Benadryl.

The **Criminal Investigation of Dr. Chua**

36.     Immediately after Carter's suicide, the Murderer Enterprise was formed. ADA Johnson conducted a vigorous and public investigation of Dr. Chua's involvement in Carter's death throughout the winter, spring and summer of 2006. On information and belief, DA Kelley, ADA Johnson and Judge Williams were adamant about holding Dr. Chua responsible for Carter's suicide.  Both DA Kelley and ADA Johnson characterized the investigation as a "drug distribution" case, though there was never any evidence of criminal drug distribution to any patient other than Carter.

37.     ADA Johnson exchanged information with the attorney for Carter's parents, James Carter II and Tammy Flannery, who filed suit against Dr. Chua in Camden County Superior Court, alleging claims for medical malpractice and wrongful death.  *See Carter et al. v. Chua,* Camden County Superior Court Civil Action No. 06V0456.   The Carter family was pushing for Dr. Chua's deposition; on information and belief, ADA Johnson was encouraging the deposition so that she could use it in her criminal investigation.  On this ground, Dr. Chua's malpractice defense counsel moved to have the deposition stayed.  The malpractice case settled in February 2007, after Chua was arrested, without his deposition having been taken.

38.     There was significant support for Dr. Chua in Camden County during this period, including from his patients and neighbors.  A particularly vocal supporter was Camden County Sheriff Bill Smith ("Sheriff Smith"), with whom Dr. Chua traveled to China in the spring of 2006 to explore medical treatment for Sheriff Smith's son, a quadriplegic.

39.     Sheriff Smith was a controversial figure in Camden County politics; he served as sheriff for 24 years, and his father for 34 years before that.  A number of political officials, including County Commissioner Berry, were constant critics.

**The September 13, 2006 Ambush of Dr. Chua Begins with his Indictment, Arrest, and Unlawful Incarceration.**

40.     On September 13, 2006, Murderer Enterprise executed a well-orchestrated ambush of Dr. Chua, one that would ruin him personally, professionally, and financially.

41.     The first step was a  nineteen-count indictment against Dr. Chua, charging him with sixteen separate counts of violating the Georgia Controlled Substances Act ("VGCSA") through unlawful prescription to Carter from September to December 2005; one count of VGSCA by keeping a dwelling place for the purpose of using controlled substances ("drug house"); and two counts of felony murder of Carter based on the underlying felony of VGSCA's.  A warrant was issued for his arrest that day.

42.     Prior to Dr. Chua's arrest, the Murderer Enterprise decided that Dr. Chua should not be jailed in the Camden County Detention Center ("CCDC") because of his relationship with Sheriff Smith.   Judge Williams immediately issued an order directing the St. Marys Police Department ("SMPD") to arrest Dr. Chua, book him in Camden County, and then transport him to the Glynn County Detention Center ("GCDC").   Because Judge Williams heard no evidence, and made no findings of fact, regarding the safety or security of the CCDC, her order was unlawful in light of *In re Irvin,* 254 Ga. 251 (1985).

43.     The SMPD officers followed Judge Williams' order to the letter: they arrested Dr. Chua at his Andrews Way office in Camden County, booked him in Camden County, and transported him to the GCPD, where he was incarcerated.

44.     By following Judge Williams' order to transport Dr. Chua to the GCDC, and incarcerating him there for a crime allegedly committed in Camden County, the SMPD officers violated their duty prescribed in O.C.G.A. § 17-4-25(a): "… It is the duty of the arresting officer to take the accused, with the warrant under which he was arrested, *to the county in which the offense is alleged to have been committed….*"

45.     Dr. Chua was held in the GCDC on 23-hour lockdown, *i.e.,* in isolation, where he had no contact with any of the other inmates and limited telephone privileges, The unlawful incarceration of Dr. Chua in Glynn County isolated Dr. Chua from his family and friends, and impeded his constitutional right to mount

a defense to the criminal charges.  DA Kelley took advantage of his unfettered access to Chua by questioning him on September 14, 2006, without his attorney present, as described in paragraph 41, *infra.*

**The Civil Conspiracy: DA Kelley Files RICO Forfeiture Action and Judge Williams Freezes Dr. Chua's Assets and Names Lambros as Receiver**

46.     The Murderer Enterprise added another element to its well-orchestrated ambush, insurance that Dr. Chua would not be able to afford good criminal defense counsel.  Simultaneously with the filing of the indictment, on  September 13, 2006, DA Kelley filed an *in personam* RICO forfeiture action styled *State of Georgia ex rel. Stephen D. Kelley, District Attorney for the Brunswick Judicial Circuit v. Noel N. Chua M.D. and Noel N. Chua, MD, P.C.,* Civ. Action No. 06V1082, in Camden County Superior Court.  The suit alleged, among other things, a VGSCA in that Dr. Chua allowed Greenwillow "to be used as a place where persons who use controlled substances and dangerous drugs…may resort", several VGSCA's based on the claim that Dr Chua's prescriptions for Carter for controlled substances and dangerous drugs were not for "a legitimate medical purpose." Without linking these alleged VGSCA's to any pecuniary gain or to any of his rental properties, the State nonetheless averred that it was entitled to forfeiture of *all* of the assets held by Dr. Chua and his professional corporation.  The suit requested as relief, among other things, appointment of a Receiver and seizure of all assets, regardless of any connection to the alleged crimes.  There was no hearing on the underlying facts of

this *in personam* RICO seizure action, and DA Kelley's motion provided nothing to safeguard Dr. Chua's constitutional rights in both the criminal and civil cases.

47.     Simultaneous with the filing of the RICO action and indictment on September 13, 2006, ADA Diane Dodd filed a notice of claim of RICO liens, on all Dr. Chua's properties in Camden County.

48.     Simultaneous with the filing of the indictment, RICO action, and notice of lien on September 13, 2006, Judge Williams issued an order granting *all* of the relief requested in the RICO complaint.  Judge Williams appointed Lambros as Receiver, and issued a temporary restraining order ("TRO") which, among other things, forbade Dr. Chua from accessing any of his property and froze all of Dr. Chua's assets, giving sole control of all his assets to Lambros. The effect of this order was that Dr. Chua had no financial means to mount a defense to either the civil or criminal action, in violation of his constitutional rights.

49.     On September 13, 2006, the Murderer Enterprise intentionally acted to strip Dr. Chua of his liberty, his property and his constitutional rights, by abusing the power of the Brunswick Judicial Circuit justice system.

**The Conspiracy Continues on September 14, 2006 with DA Kelley and Ekonomou Questioning Dr. Chua without his counsel present.**

50.     Because Dr. Chua had no access to any of his assets, friends and family retained Robert L. Crowe ("Attorney Crowe"), a Brunswick defense attorney, to represent Dr. Chua in both the criminal and RICO matters, and made

contributions to pay Attorney Crowe.  Attorney Crowe immediately filed a motion for bond for Dr. Chua on September 14, 2006, the day following his arrest.

51.     Later that afternoon, while Dr. Chua was unlawfully incarcerated in Glynn County, he was taken by Glynn County Sheriff's deputies from the GCDC to the office of the District Attorney in the Glynn County Courthouse, across the street. In an office or conference room in the Brunswick DA's office, he was questioned by DA Kelley and  Ekonomou about his assets, property and other details of his life.  Dr. Chua was not informed of his right to have counsel present, nor was Attorney Crowe notified of the interview.   No recording was made of the interview.

52.     Twelve days later, on September 26, 2007, Ekonomou filed a "Notice of Deposition" of Chua by the Receiver for 5:00 PM on September 14, 2007, in the Glynn County Jail.  This *post hoc* false characterization of the forced interview as a "deposition" was part of the conspiracy to violate Dr. Chua's constitutional rights.

53.     Violations of Dr. Chua's constitutional rights by the Murderer Enterprise continued throughout the RICO proceedings which did not terminate until September 18, 2017.

**Motion for Disqualification and Recusal of Judge Amanda Williams**

54.     A hearing was set for September 27, 2006 at 2:00 PM for Attorney Crowe's motion for bond.   Before the time set for a bond hearing, Attorney Crowe and DA

Kelley met with Judge Williams, who said she would not hear the bond hearing. She reported to Attorney Crowe and DA Kelley that she had told Sheriff Smith she would not hear it because she "was not going to set a bond for a murderer."   As a member of the Murderer Enterprise, Judge Williams had clearly predetermined Dr. Chua's guilt.

55.    Attorney Crowe filed a Motion for Disqualification and/or Recusal of Judge Williams on September 29, 2006, based in part on her manifestation of "partiality and/or personal bias and/or prejudice" in prejudging Dr. Chua "a murderer", as described in paragraph 54, as well as Judge Williams' mandatory bond and sentencing policy for drug offenses, which he argued were unconstitutional.

56.    Judge James R. Tuten, Jr., then chief judge of the Brunswick Judicial Circuit, presided over the bond hearing, which took place finally on October 6, 2006. Attorney Crowe presented seven witnesses who testified to their belief that Dr. Chua  would return to court to face his criminal charges.  One of Dr. Chua's patients testified that he had so much faith in Dr. Chua that he was willing to post his $125,000 property as bond.  Dr. Chua testified that he did have friends and family in Turkey, China and the Philippines, but would give up his U.S. passport. Dr. Chua also pointed out that he returned from his trip to China a few months prior, knowing he was under investigation and might be arrested.  Chua testified that he would "definitely" return to court to face the criminal charges.  ADA

Johnson argued against bond, arguing that even without a U.S. passport Dr. Chua could board a plane in St. Marys and fly to the Bahamas.  ADA Johnson also told Judge Tuten that the prosecution was ready to go to trial on November 13, so that Dr. Chua would be confined "a mere 40 days more."

57.    Judge Tuten denied bond, stating he considered Dr. Chua a flight risk because of his international contacts.  Judge Williams continued to unlawfully confine Dr. Chua in the Glynn County Detention Center.

58.    After Dr. Chua was denied bond, on October 8, 2006, Dr. Chua's family terminated Attorney Crowe's services.  Family, friends and supporters provided the funds to retain Atlanta attorney Donald F. Samuel of Garland, Samuel & Loeb, P.C.  ("Attorney Samuel") to represent Dr. Chua in both the criminal and civil matters.   Attorney Crowe filed a motion to withdraw as Dr. Chua's defense counsel on October 10, 2006.

59.    Two weeks later, on October 24, 2006, Attorney Samuel withdrew the motion to recuse filed by Attorney Crowe on September 29, 2006.   When asked about the withdrawal of the motion by Attorney Crowe, Attorney Samuel said he had done so because Judge Williams had agreed to release some of the funds that had been seized from Dr. Chua for a retainer for Attorney Samuel.

60.    On November 3, 2006, Judge Williams issued a Consent Order in the RICO case, directing Lambros, in addition to paying his own fees of $24,711.77, to

provide Attorney Samuel with two separate retainer payments of $25,000, one immediately and another when Dr. Chua's Greenwillow residence (occupied at that time by Dr. Chua's family) was sold.  On January 9, 2007, Judge Williams issued another Consent Order in the RICO case, directing Lambros to pay his own fees of $18,473.34 and Attorney Samuel $25,000 as an additional retainer "at such time as it is determined by the Receiver that such payment or a portion thereof is economically feasible".

61.    Throughout the entire criminal and civil proceedings, Attorney Samuel received only one payment of $25,000 from the receivership estate on October 31, 2006, four days before Judge Williams issued the order directing it.  The Murderer Enterprise duped Attorney Samuel as well.

62.    Attorney Samuel's withdrawal of the motion to disqualify and/or recuse on October 24, 2006, left in place a presiding judge who had demonstrated that she believed that Dr. Chua was a murderer.  Her offer to Samuel to provide him with a retainer in exchange for his withdrawal of the motion to recuse, was nothing more than a bribe. Throughout the proceedings in both the criminal and civil cases, Judge Williams acted as a member of the Murderer Enterprise in her rulings in both criminal and civil cases, her interaction with the jury in the criminal case, and her statements from the bench in the criminal case.

**The Receiver Begins the Process of Depleting Dr. Chua's Assets**

63.     On October 11, 2006, Attorney Samuel filed the Answer and Defenses of Defendants in the RICO forfeiture case.  Samuel averred that the lack of a pre-seizure hearing violated Dr. Chua's rights under the Due Process Clause and O.C.G.A. §§ 16-14-7(e) and 16-13-49(q)(2)(B).   The Complaint was deficient on its face because it did not identify (1) any predicate act which generated "proceeds" subject to forfeiture, (2) what property represented the proceeds of any criminal activity, or (3) what property was used to facilitate the commission of any criminal offense, in violation of O.C.G.A. § 16-13-49; failed to identify separate predicate offenses that would support a RICO allegation; failed to allege with sufficient particularity the attributes of the Dr. Chua and his PC that would satisfy the "enterprise" element of RICO, as required by O.C.G.A. § 16-14-3(6); and sought, by seizing all of Dr. Chua's assets, relief in excess of O.C.G.A. § 16-14-5's maximum fine of $25,000.   Samuel further averred that the use of the RICO forfeiture provisions to deprive Dr. Chua of all of his assets, without any showing of relationship between the property and the alleged criminal acts, as well as the appointment of a receiver to manage all of Dr. Chua's assets without a hearing and to pay himself fees, unconstitutionally deprived Dr. Chua of his property without due process.  Attorney Samuel also noted that there was no showing that any of

the forfeited property was acquired during or after the time of the alleged criminal activity.

64.     There was *never* any hearing on the factual and/or legal basis for the RICO forfeiture action.   Rather, the Receiver acted from 2006 until 2015, with the approval of the Court, to deplete all but $14,274.01 of Dr. Chua's assets, which amount was deposited in the Camden County Superior Court registry on July 31, 2015, and released to Dr. Chua on September 21, 2017.

65.     On October 12, 2006, the day after Attorney Samuel filed the Answer pointing out the legal and factual deficiencies of the RICO forfeiture complaint, he nonetheless signed, along with Dr. Chua, a Consent Order which granted a preliminary injunction that encompassed the provisions of the TRO described in paragraph 38, leaving Chua's assets frozen and Lambros as Receiver.

66.     Within ten days of his appointment, on September 22, 2006, Lambros transferred $25,000.00 from the receivership account to the IOLTA account of Ekonomou Atkinson & Lambros, LLC ("EAL firm").   He began filing Applications for Interim Compensation ("Application") shortly thereafter, attaching invoices from his firm Ekonomou Atkinson & Lambros, LLC. to Judge Williams regarding the "Chua Receivership." Ekonomou, calling himself "Counsel for the Receiver", had regular fees and expenses in these invoices.

27

67.     The First and Second Applications were approved by consent order, which also directed Lambros to make payments to Attorney Samuel.  On November 3, 2006, Judge Williams issued a consent order approving Lambros' First Application for Interim Compensation (which does not appear in the Camden County Superior Court's file in this case) in the total amount of $24,711.77.

68.     On November 6, 2006, Lambros filed his Second Application for Interim Compensation, seeking $18,473.34.  The attached invoice from Lambros' firm, Ekonomou Atkinson & Lambros, LLC, showed billings from Lambros and Ekonomou.  The application for fees and expenses, and another $25,000.00 for Attorney Samuel when the Receiver saw fit, was approved in full by consent order on January 11, 2007.

69.     On November 16, 2006, Lambros filed Receiver's First Report and Accounting.  Lambros reported that Dr. Chua's assets included cash and checks, bank accounts, real property, automobiles, personal property, and all assets of his medical practice, including accounts receivable and business equipment.  Lambros reported on the following seized assets:

    a.      cash and checks totaling $19,539.45;

    b.      four bank accounts (one in Navy Federal Credit Union, three in Coastal Bank) containing funds totaling $109,336.84;

c.      six parcels of real estate with mortgage balances totaling $839,830.97, requiring monthly mortgage payments of $6,952.02;

d.      a million-dollar life insurance policy with a cash value of on November 15, 2006 of $31,924.76 and surrender value of $3,809.33;

e.      a simple IRA with Oppenheimer investment accounts totaling $39,913.59 ("Oppenheimer IRA");

f.      four automobiles: a 2002 Toyota Tacoma; a 2001 Toyota Highlander; a 2000 Dodge Neon Sport; and a 1999 Dodge Caravan.  The Receiver reported that the 2001 Toyota Highlander was in the possession of the SMPD.  He also falsely reported that the "other vehicles are being used by Dr. Chua's family with Receiver's permission."; in fact, all four vehicles were sequestered;

g.      Chua's medical office, for which the Receiver had hired two clerical employees to provide former patients with access to their medical records, to manage and collect the outstanding accounts receivable, and to file necessary insurance claim forms; and

h.      The Receiver reported a total of $149,300.22 in accounts receivable (of which he claimed to have collected $42,300.22), and rental income of $9,000 received as of the date of the report.  The Receiver reported that monthly rental income should be $5,500.

Lambros reported that he had opened a receivership bank account at SunTrust Bank for the deposit of seized assets and the payment of receivership expenses. His "accounting" consisted of only a computer-generated ledger showing payments and deposits, many of which were "split" deposits, without designation of the source.

70.     The ledger attached to the first Report as Exhibit "B" directly contradicts the Report.  Other than depositing the liquid assets (cash, checks and bank accounts totaling $109,336,84) the Receiver deposited only $28,395.93 in rental and accounts receivable income, $22,939.41 less than the $51,300.22 he reported to the court. Lambros had paid his own firm $25,000.00 (transferred to the firm's IOLTA account on September 22, 2006) and Attorney Samuel $25,000.00, and the account balance on November 14, 2006 was only $68,539.13.  Even a cursory review of the Report and "Accounting" should have put Judge Williams, DA Kelley and ADA Johnson on notice that, at a minimum, the Receiver was either not collecting all the receivables, or was depositing the proceeds elsewhere.   As members of the Murderer Enterprise, they accepted the reports and Judge Williams ordered the payments.

71.     Lambros regularly filed Applications for Interim Compensation, at least once a month, beginning in January 2007:  the Third for $14,682.22 on January 5,

2007; the Fourth for $5,405.06 on January 11, 2007; and the Fifth for $13,695.00 on February 7, 2007.

72.     The Third, Fourth and Fifth Applications were granted in full by orders (not consent orders as was the case for the First and Second Applications) of Judge Williams signed on March 26, 2007.

73.     On April 3, 2007, Judge Williams signed a Consent Order for the Receiver to sell the rental property at 806 Mission Trace at a "price of not less than $135,000.00."

74.     Lambros filed his Second Report on May 29, 2007.   He reported the following on the seized assets:

    a.     $43,885.31 in the operating account;

    b.     the five remaining parcels of real estate with a mortgage balance of $832,210.24, requiring monthly mortgage payments of $6,952.02.   The monthly mortgage payment was reported inaccurately; with the sale of 806 Mission Trace, that amount was reduced by $533.02, and should have been reported as $6,419.00;

    c.     The Oppenheimer IRA with assets totaling $39,913.59;

    d.     The same four automobiles, three of which he still falsely claimed were being used by Dr. Chua's family;

e.    The medical office was closed on March 13, 2019, the clerical employees released, and the remaining patient files transferred to the Receiver's office in Atlanta;

f.    Accounts receivable were still in the process of being collected, but no report of the amount collected and what was outstanding;

g.    the same life insurance policy, now with a cash value of $37,608.36 and surrender value of $10,616.18.

75.    The accompanying ledger reveals more detail and clearly demonstrates the false reporting and continued mismanagement of the receivership account:

a)  The amount of a deposit made on November 9, 2006 was changed from $2,050.00 (in the First Report) to $1,050.00 (in the Second Report), with no explanation.

b)  The Receiver should have collected six months of rent on the five remaining parcels, and five months rent on 806 Mission Trace, or a total of $32,100.00.  Only six deposits totaling $6,890 were listed as rental income, two each for 806 Mission Trace, Greenwillow, and Andrews, with over $20,000.00 not reported.

c)  For the two different labels for accounts receivable in this report, there were five "medical profession" deposits from November through

February totaling $8,134.16, and three "patient balance" deposits totaling $748.77 – or only $8,882.93 for accounts receivable.

d) There were seventeen "split deposits" from December through May, totaling $35,517.44.

e) Total income deposits for a six-month period were $51,290.37.

f) There was an unidentified "transfer of funds" into the receivership account on May 1, 2007, for $52,958.67, presumably the net amount for the sale of 806 Mission Trace, although the Receiver never reported any of the details – sales price, commissions, etc. – of the sale.

76. During this time, Lambros paid his firm $51,968.06, nearly $700.00 more than the collected rentals and accounts receivable. The balance in the receivership account on May 15, 2007 was only $43,885.31. Judge Williams, DA Kelley and ADA Johnson knew, or should have known, that the Receiver was not providing proper accounting. As members of the Murderer Enterprise, they acquiesced in Lambros' actions as Receiver, including his false reporting.

77. Once the medical office was closed in March 2007, the two clerical employees who had been assisting the Receiver with the accounts receivable were no longer available to Lambros, and his office should have been proceeding with collecting the remaining receivables. As of July 27, 2007, the Receiver had deposited only about $60,000.00 of the $149,000.00 accounts receivable he had

33

reported in November 2006.  The Receiver never accounted for the remaining $89,000.00.  The receivables were either not collected, or were diverted elsewhere.

78.    On July 27, 2007, Ekonomou asked that the Receiver be relieved of further obligations to collect accounts receivable in a motion for direction.  Ekonomou claimed that the Receiver had noticed improprieties in Dr. Chua's billing, suggesting that he was seeking higher reimbursements than were allowed for the services he had performed; however, none of these "improprieties" was specified. Ekonomou asked the Court for permission to provide his preliminary findings to the proper authorities and to be released from collecting any further receivables. On August 6, 2007, DA Kelley filed a response, consenting to the relief requested by Ekonomou.  Based on the Reports and DA Kelley and ADA Johnson knew, or should have known, that the Receiver was not acting properly and was not preserving Dr. Chua's assets.

79.    The Receiver had filed Applications for Interim Compensation 6-11, seeking a total of $31,048.43 in fees and expenses for March – July 2007.

80.    Although the Receiver had paid Dr. Chua's quarterly estimated taxes in December 2006, the Receiver did nothing about Dr. Chua's 2005 income taxes.  In August of 2007, the IRS served the Receiver with a Notice of Levy of $118,788.58 for Dr. Chua's 2005 income tax.

81.     On August 13, 2007, Attorney Samuel filed a Motion to Dissolve Receivership and Cancel RICO lien, and requested a hearing on the motion. Samuel noted that the Receiver had already received approximately $77,000 in approved fees and expenses, and had petitioned the Court for another $28,336. Attorney Samuel pointed out that of this approximately $105,000 allotted to the Receiver, none had been available to Dr. Chua to handle his defense and/or to pay the necessary medical experts and none would be left to the State if it were successful in its RICO claim.  Attorney Samuel argued that there had never been any basis for the preliminary injunction in October 2006:  there had been no hearing on the seizure and no predicate acts in the RICO complaint justifying the receivership.  He noted Dr. Chua's maximum fine in the RICO action was $25,000.00, and the Receiver had billed the estate four times that amount.  Noting that the Receiver had failed in his duty to preserve assets, Attorney Samuel requested that the receivership be dissolved and the RICO liens cancelled.

82.     The State's response to the Motion to Dissolve was not filed until September 11, 2007.   ADA Diane Dodd argued that the motion to dissolve was not procedurally proper and that Attorney Samuel's contentions were without merit. The Murderer Enterprise's conspiracy to deprive Dr. Chua of his assets continued.

83.     Judge Williams knew that any ruling on the Motion to Dissolve could be appealed.  There was never a hearing and never a ruling on the Motion to Dissolve.

As a member of the Murderer Enterprise, Judge Williams acted to continue the depletion of Dr. Chua's assets.

84.    On September 18, 2007, apparently in response to Attorney Samuel's argument that there were no predicate criminal acts, DA Kelley filed an Amended Complaint in the RICO forfeiture action. The Amended complaint alleged other VGCSA's, many of which occurred after Carter's death.  There was no specific allegation that Dr. Chua benefitted financially from these alleged acts, as required by the Georgia RICO statute.

85.    DA Kelley was never required to produce any evidence in the RICO case to support the new criminal allegations and, in fact, did not present the information in the trial.  *See infra*.

86.    Although she never ruled on the Motion to Dissolve, on September 20, 2007, Judge Williams granted the Motion for Direction, directing the Receiver to cease and desist from further collections of accounts receivable and to report his findings on billing improprieties to the proper authorities, thus furthering the Murderer Enterpise's efforts to deprive Dr. Chua of his assets to continue.

87.    On September 21, 2007, Ekonomou filed a Motion to Sell Real Property, in which he reported that the balance in the receivership account was $14,016.96.  He claimed falsely that the monthly mortgage payments for the remaining real property totaled $9,000 and the only estate income was $2,700, rent on only two of

the five remaining properties.   Ekonomou noted the IRS lien of $118,788.58, and stated that the Receiver did not have sufficient funds to pay the lien.  The Receiver therefore moved for permission to sell the office duplex at 125 Andrews Way, and alleged that there was a buyer offering $200,000.00 for the property.

88.     Lambros filed his Third Report and Accounting on the same day, with the following information about the seized assets:

a.     Cash and checks totaling $19,539.45 (which was deposited into the receivership account in September 2006 and had long since been depleted);

b.     Bank accounts totaling $109,336.84 (which had been deposited into the receivership account in September 2006 and had long since been depleted);

c.     The five remaining parcels of real property, with narratives regarding each:

- 125-A/B Andrews Way – office building; half is occupied by tenant; Receiver states note matures on October 17, 2007, and there are insufficient funds to cover it;

- 175 A/B Lakemont Drive – residential rental duplex which had been rented for $1200/month, was no longer occupied; on the market with pending contract; no mention of rental income or sales price;

37

- 812 Mission Trace Drive – residential single-family rental that had rented for $900/month; tenant vacated in breach of rental income; Receiver determined that is not in the best interest of the receivership estate to pursue collection of past due rent; currently on the rental market;

- 124 Huntington Drive – residential single-family rental; currently rented at $850/month; and

- 1022 Greenwillow Trace – formerly Dr. Chua's residence, now occupied by Dr. Chua's sister and family with permission from the Receiver.

d.      The same life insurance policy with $44,224.18 cash value and $17,781.02 in surrender value as of September 11, 2007;

e.      The same Oppenheimer IRA with same amounts as the First Report;

f.      The same four automobiles, three of which he continued to falsely report were being used by Dr. Chua's family;

g.      Office building – all patient files in Receiver's office in Atlanta;

h.      Accounts receivable – no amounts reported; noted motion for direction regarding improprieties in Dr. Chua's pre-receivership billing practices, with no ruling from the Court [although Judge Williams had granted his motion the day prior]; no information about rental income;

38

i.     IRS Notice of Levy – Receiver served in August 2007 with Notice of
Levy demanding payment of $118,778.58 in Form 1040 tax for the period
ending December 31, 2005.

89.    Again, the ledger provides more details and more falsities.  For one thing, it
contradicted the claims in Ekonomou's motion in at least two respects:  total
monthly payments on mortgages was $6,232.63, not the $9,000.00 cited by
Ekonomou; and three (Andrews, Huntingdon, and Greenwillow) properties were
occupied and were producing rental income of $3,350.00, not the $2,700 cited by
Ekonomou.   The ledger showed two $1,000.00 rental payments for Greenwillow.

90.    The ledger did confirm a disturbingly low balance of $14,016.96, as
Ekonomou had reported.  Total deposits from May-September 2007, were only
$13,796.52, of which  $170.39 was labeled as accounts receivable; $5,250 as rental
income (for Andrews and Greenwillow only); and $8,376.13 as "split" deposits.

91.    In the first year of the receivership, the receivership estate should have
collected around $200,000 - $52,500 in rental income and $149,000 in accounts
receivable.  Other than the liquid assets and the proceeds from the sale of 806
Mission Trace, the Receiver deposited less than half that amount, or $93,482.87.
There was no explanation provided for the missing $108,017.43.

92.    Jury selection in Dr. Chua's trial was scheduled to begin on October 9, 2007.
As of the date of the Receiver's Third Report, there was only $14,016.96 in the

receivership account; the Receiver had provided only $25,000 for Dr. Chua's defense, and had paid the EAL firm $76,967.39.

93.     The Murderer Enterprise continued using the judicial system to unlawfully deprive Dr. Chua of his assets.

**The Pretrial Prosecution of Dr. Chua from September 2006 to October 2007**

94.     While the Receiver was squandering Dr. Chua's assets, Attorney Samuel's office was attempting to defend Dr. Chua in the criminal case, but was stymied by the Murderer Enterprise on that front as well.

95.     On October 19, 2006, defense counsel filed a motion to dismiss the two felony murder counts of the indictment, arguing that prescription of drugs by a doctor to a patient could not constitute an underlying felony for a felony murder charge unless it was inherently dangerous or death was foreseeable.  Since there was no suggestion that Carter was allergic to the medications Dr. Chua prescribed or that Dr. Chua had knowledge that Carter was stockpiling drugs, was addicted to drugs or was suicidal, the felony murder counts should be dismissed.  Judge Williams did not hear this motion until February 20, 2007.

96.     On October 20, 2006, the defense filed a motion to have Dr. Chua transferred to the Camden County Detention Center.  Judge Williams issued an Order on October 30, 2006, in which she found that Dr. Chua had been incarcerated in Glynn County because it was more appropriate than detention in Camden County (an

inadequate finding, according to *Irvin, supra,* to justify the September 13th transport to the GCDC and lockdown), and provided DA Kelley with ten days to show good cause why Dr. Chua should not be transferred to Camden County. On November 2, 2006, Judge Williams issued an order remanding Dr. Chua to the custody of the Camden County Sheriff.

97.     On the motion to dismiss the felony murder counts, Judge Williams ruled on February 20, 2007 that Counts 1 and 2, which alleged felony murder without specifically identifying the prescription drugs Dr. Chua prescribed, were dismissed. Judge Williams left in place all of the remaining counts of the indictment, and refused to require that the State specify its allegation that Dr. Chua prescribed drugs for Carter "for unlawful medical purposes" and/or "not in the usual practice of his business". Having denied Attorney Samuel's motion to dismiss, Judge Williams granted the State's motions for jury sequestration and to seal the jury list.

98.     In the spring and summer of 2007, DA Kelley and ADA Johnson told Attorney Samuel that they would refer the entire Chua case to federal prosecutors. A federal prosecutor was assigned to the case, and he attended the depositions of two experts hired by Attorney Samuel, both of whom opined that Dr. Chua's course of treatment of Carter was appropriate. The federal prosecutor thus determined that the case should be disposed of with a sentence of probation. Dr.

Chua declined to plead guilty to any crime, and the federal prosecutor refused to prosecute him.

99.    Despite the decision of the federal prosecutor, the Murderer Enterprise refused to give up.   DA Kelley and ADA Johnson continued a vigorous prosecution of Dr. Chua throughout the summer of 2007.  They were soon joined by another conspirator, County Commissioner Steve Berry.

100.   Berry was a licensed Georgia attorney engaged in private practice in Camden County.  Berry had served on the County Commission since 1996 and was in the position to approve, or disapprove, the budgets both of the Sheriff's and DA's offices.  DA Kelley believed that Berry hated Sheriff Smith. Berry wanted Sheriff Smith hurt, and sending his friend to prison would fill the bill.  On information and belief, Berry became a member of the Murderer Enterprise during the summer of 2007.

101.   In July 2007, Chua supporters attempted to present a petition to the Camden County Commissioners in one of its regular meetings, calling for the Commissioners to support Dr. Chua's release on bond.  Berry responded by telling the supporters that the

102.   DA Kelley made plea offers to Dr. Chua, which Dr. Chua rejected.  Dr. Chua refused to plead guilty to any crime.  DA Kelley believed, without any evidence,

that Dr. Chua rejected the offers because "the sheriff told him not to take it, he could fix the jury."

103.   On July 26, 2007, ADA Johnson filed an unprecedented motion to remove Dr. Chua from the custody of Sheriff Smith and recuse Sheriff Smith from any further proceedings in the criminal action, on the grounds that Sheriff Smith and Dr. Chua were close personal friends, Sheriff Smith was supporting Dr. Chua in the criminal matter, and that Dr. Chua was not secure in the Camden County jail. A hearing was set for said motion on August 15, 2007.  A few days before the hearing, ADA Johnson subpoenaed Sheriff Smith, several of his deputies, and some 20 of Dr. Chua's family and friends, to testify in support of her motion.

104.   On August 15, 2007, Judge Williams issued a consent order in which she directed that Dr. Chua would remain in the Camden County jail, but that all further proceedings in the criminal case would take place in Glynn County. Specifically, she ordered that Sheriff Smith would transport Dr. Chua to Brunswick for any proceedings, relinquish custody to the Glynn County sheriff, and retake custody and transport Dr. Chua back to Camden County at the conclusion of the proceedings.  Judge Williams also ordered that the Camden County Clerk draw a list of 250 potential jurors from Camden County, notify them of the date to report, and keep the list under seal.  The potential jurors would be transported by the Glynn County Sheriff to Glynn County for any proceedings.

105.    On August 20, 2007, Judge Williams issued an order setting jury selection in the criminal trial for October 9, 2007, with the trial to begin on October 15, 2007.

106.    The State made a number of pretrial filings in September 2007, including a Motion to Sequester Jurors on September 11, 2007, and two Notices of Intent to Present Evidence of Similar Transactions.

107.    The first Notice of Intent, filed September 11, 2007, described several incidents of prescriptions by Dr. Chua that the State alleged were improper.  There were 28 allegations of unlawful prescriptions for 16 Jane Does and 9 John Does. Of the 28 allegations, seven dates were unknown, and fourteen took place after Carter's death.

108.    The second Notice of Intent was filed on September 21, 2007.  It alleged unlawful possession of narcotics in Dr. Chua's locked desk drawer at the medical building; improper prescriptions to Jane Doe #8 and John Doe #9 (as described in the First Notice), and introduced a new John Doe #10.

109.    According to the prosecution, John Doe #10 had been allowed to shadow Dr. Chua, live in his house, and travel with him to Europe in 2004-2005, before Doe reached the age of 18, and reported that he and Dr. Chua had had a romantic relationship.  John Doe #10 was not a patient of Dr. Chua's, and there was no allegation of Dr. Chua prescribing any drugs for John Doe #10.  This Notice was the first Attorney Samuel had that the prosecution intended to submit evidence

hat Dr. Chua and Carter had had a homosexual relationship, which they would argue meant that Dr. Chua's prescriptions for Carter were unlawful.

**The Pretrial Motions Hearing on October 1, 2007**

110.   In the motions hearing on October 1, 2007, the State argued in favor of the evidence of John Doe #10  who would testify that he and Dr. Chua had a homosexual relationship a few years before Carter's death.  ADA Johnson made her intentions clear: the State wanted to put in the evidence as proof of its theory that Dr. Chua was prescribing narcotics for Carter not for a legitimate medical purpose, but to entice Carter into a romantic relationship.  Attorney Samuel vehemently objected to John Doe #10's testimony, arguing that it was irrelevant, "the most crass type of character assassination" and "outrageously prejudicial."

111.   Judge Williams ruled that "if [the State] can show, at least circumstantially, an intimate relationship between the decedent and Dr. Chua, number one, then the Court will consider this at the appropriate time and determine whether it can come in."

112.   Judge Williams granted the State's motion to allow the evidence regarding post-dated and blank prescriptions, even though most of the incidents occurred *after* the death of Carter.  Dr. Chua saw several patients on a monthly basis before prescribing a monthly dose of medication and, when he was going to be in China for two weeks in April 2006, signed several prescription forms for his staff to fill

in for the patients whose monthly examinations would take place when he was away.  Attorney Samuel argued that because there was no allegation that any of Carter's prescriptions were provided in that way, the evidence was irrelevant and prejudicial.   Judge Williams announced from the bench that that Dr. Chua had a "cavalier attitude about controlled substances that doctors are not supposed to have" and further stated that the proffered evidence "shows at least a mode of operation that he doesn't use the same respect for controlled substances that medical profession says you should have."  She granted the motion.

113.   At the motions hearing on October 1, 2007, the parties agreed to individual voir dire and sequestration of the jury.  The parties agreed that the Clerk would make the sealed jury list available to the attorneys on Friday, October  5, 2007, before  jury selection began on Tuesday, October 9, 2007.  With regard to restrictions being put in place as to who could see the list, DA Kelley stated, "I would like to think that it would stay with just the attorney and the client and just prosecution, you know, and its family…"   No order or agreement regarding restrictions was reached.

**The Berry Memo on Jury Selection**

114.   On information and belief, DA Kelley, or someone in his office, provided a copy of the jury list to Defendant Steve Berry ("Berry"),

115.    Sometime before jury selection, Berry provided a memo to the DA's office in which he made suggestions regarding particular jurors ("Berry memo").  The main thrust of Berry's comments was to avoid friends and supporters of Sheriff Smith.  Berry clearly believed that Sheriff Smith would do his best to influence the jury, and those who were most likely to be influenced should be avoided.  To this end, he wrote:

> Personally, I would avoid blacks on this jury.  I understand you have some constitutional concerns that have to be kept in mind, but try and avoid them.  Bill [Smith] has lots of ties there and they would be the easiest for him to get to.

116.    On information and belief, the Berry memo was copied and distributed to employees in the DA's office.  DA Kelley testified that "there were probably dozens of these copies made, I would guess."  Neither Dr. Chua nor Attorney Samuel were aware of the Berry memo and its contents.

**Jury selection in State v. Chua**

117.    Jury selection began on October 9, 2007, and was completed on October 14, 2007.

118.    The venier contained 29 potential jurors, of which seven were African-American.

119.    Five of the seven black jurors were struck by the prosecution, consistent with the advice from the then-secret Berry memo.

47

120.    Attorney Samuel made the appropriate *Batson* objection based on the disproportionate number of strikes of black jurors, the first step in the *Batson* process of establishing a *prima facie* case of racial discrimination in jury selection.

121.    ADA Johnson then responded with the second step, which was presenting facially neutral reasons for the peremptory strikes of the black jurors.  Consistent with the Berry memo, ADA Johnson articulated a relationship with Sheriff Smith, among other reasons, as a racially neutral justification for the strikes.

122.    As to each of ADA Johnson's proffered reasons, Judge Williams agreed that it was "race neutral."

123.    The third step of the *Batson* process requires the judge to make factual findings on a juror by juror basis that the prosecution's proffered reasons were the real reason for striking the juror, and not a pretext for race discrimination. Attorney Samuel argued that the reasons ADA Johnson gave for striking the African-American jurors, particularly a relationship with Sheriff Smith, were equally applicable to the white jurors who were allowed to remain on the panel.

124.    Judge Williams utterly failed to meet the required third step of the *Batson* process; she simply accepted ADA Johnson's proffered reasons, concluding "I am absolutely satisfied with the strikes."

125.    The final jury contained only one African-American.

**Trial in State v. Chua**

126.    Throughout the trial proceedings, Judge Williams and members of her staff had inappropriate contacts with the jury.

127.    The jury was provided notebooks for note-taking during the trial.  On one lunch break, the bailiff went into the jury room and instructed the jurors to give her their notebooks because Judge Williams and DA Kelley wanted to review them. The notebooks were later returned to the jurors but are not in the Court file.

128.    DA Kelley went to one juror's employer and, based on his concerns from the notebook that the juror was going to vote to acquit Dr. Chua, asked the employer for advice as to "how to push [the juror's] buttons" so that she would vote to convict.

129.    One of the jurors had an adult child who was in Judge Williams' Drug Court ("Drug Court parent").  The Drug Court parent told other jurors that the juror had promised Judge Williams a guilty verdict in exchange for Judge Williams' promise to "go easy" on the adult child.  The Drug Court parent threatened another juror with removal if that juror did not vote to convict.

130.    Judge Williams threatened to jail a juror several times during the trial.

131.    Another juror shared with other jurors that he was a friend of Carter's and "used to hang with him" ("Carter's friend").  The other jurors were afraid to report that Carter's friend had lied during *voir dire*.

49

132.    When one juror indicated during deliberations that she was leaning toward acquittal, another male juror cornered her in a threatening manner to change her vote.

**Verdict in State v. Chua**

133.    On October 20, 2007, after about eleven hours of deliberation, the jury returned its verdict.  The jury found Dr. Chua not guilty on several of the VGCSA's; guilty as to the prescriptions for oxycontin, Percocet, Demerol, and methadone; guilty of the "dwelling place" VGCSA, and guilty of felony murder.

**Dr. Chua sentenced to life imprisonment and sent to Glynn County jail.**

134.    Dr. Chua was sentenced to life imprisonment for felony murder, and five years for the VGCSA's, to run concurrently.

135.    Also on October 20, 2007, Judge Williams issued an order in open court directing the Glynn County Sheriff take custody of Dr. Chua and confine him to the GCDC until further Order of the Court.  The October 20, 2007 Order was filed on October 25, 2007.

**Post-Trial Activity**

136.    Attorney Samuel filed a motion for new trial the day following the sentencing.

137.    On October 31, 2007, Attorney Samuel filed a motion to transfer Dr. Chua to the Camden County Detention Center pending the resolution of his pending

Motion for New Trial and appeal.  Attorney Samuel pointed out that "O.C.G.A. § 42-5-50(c) provides that pending the resolution of a new trial motion or appeal, the trial court is obligated to keep the defendant in the County jail" unless there are extraordinary risks.  Attorney Samuel argued that the State could not show any extraordinary security risks posed by Dr. Chua's incarceration in Camden County, and therefore requested that Dr. Chua be confined there pending the completion of the new trial motion and appeal.

138.   Either by that time or shortly after, Dr. Chua had already been transported from Glynn County to Coastal State Prison in Garden City, Georgia.  He was imprisoned in various state facilities from November 2007 until his release on September 18, 2017.

139.   Both DA Kelley and Judge Williams essentially ignored Attorney Samuel's motion to transfer Dr. Chua.  DA Kelley was never required to show any extraordinary risks.  Judge Williams did not hold a hearing on the motion and never ruled on it, thereby preventing appeal.

**Lambros' Activities following Dr. Chua's Conviction, Further Depleting Dr. Chua's assets.**

140.   In the period between the sentencing in 2007 and the hearing on the motion for new trial in 2010, Lambros continued to deplete Dr. Chua's assets without providing any funds for his defense.

141.   On October 23, 2007, the day after Dr. Chua was sentenced, Lambros summarized the financial condition of the receivership:

Assets:  Remaining real property valued at $1,400,000 & mortgage debt of $757,000, leaving net of $658,000.00; IRA investment account with $39,730.00; cash value of life insurance policy of $17,781 **= Total net assets of $658,000.00.**  (In fact, these numbers add up to $715,511.00 in total net assets.)

Liabilities:  Lambros listed $120,000.00 for the IRS lien; $100,000.00 for realtor fees for Nancy Bailey; $75,000.00 for Receiver's fees, and $25,000.00 to Attorney Samuels to satisfy one of the consent orders = **Total liabilities of $320,000.00.** Lambros suggested that the net value of the estate was **$395,000.00.**

142.   Lambros had filed his Sixth Application for $2,203.26 on March 2, 2007; his Seventh for $9,954.72 on April 2, 2007;  his Eighth for $5,907.52 on May 4, 2007; his Ninth for $2,994.87 on June 5, 2007; his Tenth for $5,789.06 on July 3, 2007; his Eleventh for $4,379.00 on July 28, 2007; his Twelfth for $3,301.08 on September 14, 2007; and his Thirteenth for $5,056.96.

143.   On November 15, 2007, Judge Williams issued three Orders:

   (1) granting the Receiver's motion for direction regarding the billing, directing the Receiver to report his findings to the proper authorities and to cease the collection of receivables [identical to her Order of September 20, 2007};

(2) granting the Receiver the authority to sell 125 Andrews Way, and directing the Receiver to use the proceeds for the expenses of the estate, with the Receiver's fees, notably not the IRS lien, as first priority;

(3) granting the Receivers' 6th – 13th Applications for Interim Compensation. Although no specific amount was stated in the order, the Receiver had billed $39,406.47 in those seven applications.

144. Two more Applications for Interim Compensation were filed in 2007: the Fourteenth for $12,290.74 on November 8, 2007, and the Fifteenth for $20,263.29. The invoice attached to the Fifteenth Application showed double billing for Ekonomou on November 15 and 16, 2007.

145. On January 4, 2008, Lambros filed an Emergency Motion to Liquidate the Receivership Estate. He averred that the estate's only source of income was rental income of $2,350.00 from two of the five remaining properties were currently occupied. Combined debt service on all five properties was $6,200.00/month; with the balance in the receivership's account of $15,553.87, he had failed to pay the property taxes and wanted to cease making the mortgage payments on all five properties. He estimated that the five properties would have a combined equity of approximately $658,000.00.

146. Lambros proposed a seven-step plan for liquidation: (1) all real and personal property sold; (2) life insurance policy be surrendered for its cash value of

53

$17,781.00; (3) the IRA account with market value of $39,730.00 be liquidated; (4) The Receiver be paid his fees; (5) the IRS be paid the amount of its Notice of Levy; (6) the remaining funds be deposited into the registry of the Court "to be distributed as directed through settlement or through trial" and (7) the Receiver file his Final Report and Accounting and be discharged thereafter.

147.  Judge Williams entered a consent order on January 28, 2008, granting Lambros' motion and adopting his liquidation plan.

148.  On February 25, 2008, Lambros filed an Application for Approval to Employ or Retain Nancy Bailey, Realtor, to list and sell the four remaining residential properties: 124 Huntington Drive, 175 A&B Lakemont Drive; 1022 Greenwillow Drive, and 812 Mission Trace Drive, with a commission rate of five percent.  There is no record of the Court ruling on this motion.

149.  On March 4, 2008, Lambros was awarded another, even more lucrative, Receivership by DA Kelley and the Brunswick Judicial Circuit.  DA Kelley filed another *in personam* RICO forfeiture action against 24 individuals and entities associated with three truck stops in Camden County who allegedly were overcharging for gasoline.   The action also named three *in rem* defendants, the three business entities of the truck stops. *State of Georgia ex rel. Stephen D. Kelley v. Fairley Cisco et al,,* Civil Action No. 08V0302SS2 ("Cisco Complaint") Simultaneously, Judge James R. Tuten, Jr.  (the same judge who had denied a bond

to Dr. Chua) issued an *ex parte* Order, identical to the order in Dr. Chua's RICO case, naming Lambros as the Receiver and directing that he take possession of all assets of all defendants ("Cisco Order").

150.   The primary defendant in the Cisco RICO action was Fairley Cisco, a prominent businessman in Camden County.   Cisco and his family members owned and operated the three truck stops at issue.   DA Kelley was aware that Cisco was a close friend of Sheriff Smith, and as a supporter of Dr. Chua.   Cisco had provided at least $5,000.00 to Attorney Samuel for Dr. Chua's defense.

151.   The activities of the EAL firm, beginning on the date of the Cisco Order, mirrored their actions against Dr. Chua; *e.g.,* Lambros and Ekonomou met with Judge Tuten as the Cisco Order and another member of the EAL Firm "secured and seized" Fairley Cisco's home.   Ekonomou's First Application for Interim Compensation, attached billings of the EAL Firm totaling $161,797.06, for March and April 2008.

152.   From March 4, 2008 until January 31, 2013, Lambros and Ekonomou and their law firms were actively involved in managing the Cisco receivership.

153.   In Dr. Chua's case, on April 8, 2008, Judge Williams signed a consent order for the sale of the medical building on Andrews Way for not less than $400,000.00.

154.   On May 5, 2008, Lambros sent an email to DA Kelley and Attorney Samuel, in which he noted that the sale of the Andrews Way property for $420,000 was

scheduled to close that week.  He noted that payoff of the first mortgage was $231,000.00, realtor fees were $20,000, and federal and state taxes were estimated at $157.000.00, so the estate would recover only about $12,000.  Lambros suggested that the sale of the other four properties, at the prices Nancy Bailey had provided in October 2007, would net the receivership estate $383,000.00.  He estimated the remaining liabilities to be $145,000.00 - $100,000 to the Receiver, and $45,000 to the Realtors.  The estimated net to the estate was $238,000.00.

155.   Lambros having defaulted on the mortgages on Huntington, Greenwillow, Lakemont, and 812 Mission Trace, the respective mortgage holders moved to protect their interests.

156.   On May 19, 2008, Mortgage Electronic Registration Systems ("MERS") and Chase Home Finance (collectively referred to as "Chase") filed a notice of claim on Greenwillow, with a payoff amount of $308,051.56.  On May 27, 2008, Wells Fargo filed a notice of claim on 812 Mission Trace with a payoff amount of $67,334.42.

157.   On May 6, 2008, Bank of New York ("BONY"), who had acquired the mortgage on Huntington when Countrywide failed, bought Huntington in a foreclosure sale. The EAL Firm filed a motion for contempt sanctions and to set aside the foreclosure sale.  On August 19, 2008, Judge Williams signed a consent order that set aside the foreclosure sale with no sanctions; allowed Lambros until

January 20, 2009 to see Huntington; and directed BONY to pay the Receiver fees and costs for the motion.

158.   On July 28, 2008, MERS/Chase filed a Claim of Interest for the property on Lakemont, with a payoff amount of $102,160.45.

159.   On September 26, 2008, Lambros filed a motion to sell the Lakemont Drive property, attaching a contract on the property for $152,500 ($17,500 less than Bailey estimate)  The listing agent of the property was not  Bailey, but Cecily Hill, who was at that time a Republican member of the Georgia Assembly representing Camden County.   On October 6, 2008, Judge Williams signed a consent order granting the motion.   The receivership should have received approximately $41,000 from the sale after deducting the payoff amount and real estate commissions.

160.   Lambros filed his Twenty-Seventh Application for Interim Compensation on February 6, 2009, seeking $1,093.35 in fees and expenses.  Dr. Chua filed a Response to this motion on February 9, 2009, asking for a hearing on the ground that "some court participation in the administration of the estate is warranted." Attorney Samuel averred that he and DA Kelley had "in essence, been spectators as the estate has been administered by the Receiver":

> There is currently no plan to ensure that the entire estate does not simply evaporate with the majority of the money being spent to reimburse the Receiver for his expenses and his hourly billing. The Receiver is doing his job admirably.  The question is whether

this job is in need of being performed, if the only result is that the estate will end up being liquidated and neither the plaintiff, nor the defendant, receives any of the proceeds.

161.   In his Response, Attorney Samuel hearkened back to his motion to dissolve in August 2007 with his concern about paying the medical experts who had testified at trial.   Defendant Samuel reported that he had endeavored for over eighteen months to persuade the experts to delay filing a suit for fees, and that he had reached no agreement with the Receiver for the experts to be paid.

162.   Attached to the Response was an invoice for $13,203.81 to Dr. Chua, and a letter to the judge, from Dr. Alexander Morton.  Dr. Morton wrote:

> … I believe I have patiently waited payment for my services.  Mr. Samuel recently informed me that the receiver does not have any funds to pay Dr. Chua's outstanding liabilities.
>
> I have asked Mr. Samuel to forward this correspondence to you, a judge, who would be involved with the administration and oversight of the receiver who is handling the selling of Dr. Chua's estate.  What has been described to me regarding the settlement of Dr. Chua's estate and his financial liabilities does not appear just.  I have never been contacted by this receiver or agency and find his/their behavior unacceptable.   I am unfamiliar with this area of the law, however these actions sound like civil malfeasance on the receiver's part and need review and clarification.  Please help me get a better idea of what is involved in the estate's current status as well as whom I should appeal regarding my interests.  Thank you for your help.

163.   Judge Williams never ordered a hearing and never ruled on the response and Dr. Morton's letter in any way.  The Receiver never paid Dr. Morton.

164.    A few months later, on June 12, 2009, Lambros filed a motion seeking authorization for the Receiver to obtain the titles on the 2001 Toyota Highlander and the 1999 Dodge Caravan that were seized in 2006.  On September 1, Judge Williams signed the order granting same.

**The Georgia Supreme Court declares *in personam* RICO forfeiture cases unconstitutional.**

165.    On June 15, 2009, the Georgia Supreme Court issued its decision in *Cisco v. State,* 285 Ga. 646 (2009) in an appeal from several orders denying motions to dismiss the RICO forfeiture cases against the Cisco *in personam* defendants.  The Supreme Court ruled against DA Kelley, declaring the RICO *in personam* proceedings were unconstitutional.

166.    The Supreme Court ruled that pre-conviction RICO proceedings utilized in the Cisco Complaint and Order (identical to the proceedings instituted against Dr. Chua) were unconstitutional because they were criminal, not civil, in nature and defendants were not provided with "all of the constitutional safeguards due a criminal defendant."  The Court went on to rule that " …. [T]herefore, O.C.G.A. § 16-14-7(m) is unconstitutional because it deprives *in personam* forfeiture defendants of the safeguards of criminal procedure guaranteed by the United States and Georgia Constitution."  285 Ga. at 658.

167.    This ruling effectively nullified, at the very least, the actions of the conspirators from September 13, 2006 until October 20, 2007.  prior to Dr. Chua's

conviction.   Neither DA Kelley nor any of the other conspirators changed any of their activities as a result of this decision; they simply continued with their conspiracy to deplete Dr. Chua's assets.

**Despite *Cisco* ruling, Lambros continues the depletion of Chua's assets.**

168.   The transcript of the trial was finally completed by Judge Williams' court reporter, Gloria Griffin-Kennedy, in July 2009.  The transcript fee was $14,014.57; Griffin-Kennedy noted that a $5,000.00 deposit had been paid, and sought a total of $9,505.97.

169.   Attorney Samuel was forced to file a consent motion on July 20, 2009, to have Camden County pay the court reporter from county funds, noting that the Receiver had agreed to pay a $5,000.00 deposit to the court reporter in April 2008 from receivership funds, that the final bill was $9,505.97, and that the Receiver had stated there were no funds available from the estate to pay the court reporter. There had been no account or report from the Receiver since September 21, 2007, so there was no way to verify whether or not the funds were available.

170.   On September 30, 2009, Judge Williams signed a consent order for the sale of 812 Mission Trace for $95,000.00, $25,000.00 less than the 2007 Bailey estimate. The receivership account should have netted approximately $20,000 from the sale of 812 Mission Trace.

171.   Lambros filed no reports in 2008 and 2009, and provided no accounting to the Court.       He did, however, continue to file Applications for Interim Compensation:

| 14 | 11/8/2007 | $ 12,290.74 |
| 15 | 12/10/2007 | $ 20,263.29 |
| 16 | 1/11/2008 | $  6,217.93 |
| 17 | 2/7/2008 | $ 10,618.29 |
| 18 | 5/9/2008 | $ 22,796.56 |
| 19 | 6/6/2008 | $  6,643.32 |
| 20 | 7/9/2008 | $  7,513.88 |
| 21 | 8/6/2008 | $  7,023.66 |
| 22 | 9/19/2008` | $  5,041.92 |
| 23 | 10/7/2008 | $  2,125.91 |
| 24 | 12/1/2008 | $  2,821.66 |
| 25 | 12/23/2008 | $    672.70 |
| 26 | 1/12/2009 | $    653.90 |
| 27 | 2/6/2009 | $  1,093.35 |
| 28 | 4/7/2009 | $  1,725.40 |
| 29 | 5/7/2009 | $  1,841.70 |
| 30 | 6/12/2009 | $    353.40 |

 31                        7/10/2009                    $   1,528.76

The Thirteenth and Fourteenth Applications were ordered paid in full by Judge Williams on April 21, 2008, even with the double billing by Ekonomou in the Fourteenth Application.  There are no orders in the file regarding Applications 15-31.

**Proceedings on Motion for New Trial**

172.   Judge Williams' court reporter, Gloria Griffin-Kennedy, took nearly two years to complete the transcript of the trial, which was necessary for the Motion for New Trial filed on October 25, 2007.  The transcript and exhibits were finally filed on July 2, 2009, and Griffin-Kennedy sent Attorney Samuel an invoice for transcript fees.

173.   The Motion for New Trial was not heard until March 2, 2010, nearly two and a half months after Dr. Chua was sentenced.  DA Kelley had been appointed by Governor Sonny Perdue to a new Superior Court judgeship in the Brunswick Judicial Circuit, but had not yet been sworn in; he appeared on behalf of the State with ADA Johnson, who had already announced her candidacy for the District Attorney position vacated by Kelley and been endorsed by Judge Williams.

174.   Judge Williams heard limited oral argument from DA Kelley, ADA Johnson, and Attorney Samuel in the March 2, 2007 hearing, which lasted less than an hour. She ordered that the 2007 briefs of both parties regarding the admissibility of the

John Doe #10 be unsealed and added to the record, and stated she would issue her decision after the record had been supplemented.

175.   The record shows that the State filed its brief on March 16, 2010. Attorney Samuel's brief is not in the record of the Camden County Clerk.  On April 26, 2010, Judge Williams issued an Order denying the motion for new trial with no explanation.

176.   Attorney Samuel filed a Notice of Appeal on May 3, 2010.

**The Receiver files his first report since September 2007 and seeks direction for wind down of the estate.**

177.   On April 21, 2010, five days before Judge Williams denied the motion for new trial, Lambros filed his [fourth] report styled:   Receiver's Report and Accounting and Motion for Direction as to the Wind Down of the Receivership Estate.   He had provided no accounting information since his Third Report on September 21, 2007.

178.    The Receiver reported that the balance in the receivership account was $19,092.38.  He reported that he controlled only four other assets:  Dr. Chua's IRA (which Judge Williams had ordered dissolved in 2008) with a market value of $39,122.57; the 2001 Toyota Highlander with an estimated value of $4,000.00; the Greenwillow home (which Judge Williams ordered sold in 2008) with no equity; and various personal property estimated at $1,000.00.   He reported liabilities against this $63,214.95 in assets as follows:  Receiver's fees of $63,214.95; 941 taxes

for the second ($533.13) and third ($10,216.45) quarters of 2006 totaling $10,749.58; Osprey Cove HOA dues of $3,332.81; Prudential Magnolia Realtors (Cecily Hill) for $4,898.19; and Nancy Bailey for $25,740.00.

179.    The Receiver provided no information about the disposal of the other assets listed in his 2007 Report, specifically the sales of Andrews and Lakemont approved by consent orders in 2008 and the sale of 812 Mission Trace approved by consent order in 2009, the disposition of Huntington, and the loss of any equity in Greenwillow.  The Receiver did not advise the Court regarding the settlement of the IRS lien.

180.    A review of the ledger "Accounting" entries suggests dishonesty to the Court, mismanagement, comingling of receivership funds with the EAL Firm, and no real accounting of the handling of Dr. Chua's assets.

181.    In September-December 2007, the Receiver deposited $23,242.42, of which $8,650.00 appears to be rental income; there is a deposit on November 19, 2007 of $37.06 labeled "miscellaneous income"; and another deposit of $14,555.36 on December 11, 2007, mysteriously labeled "settlement income."  There was one payment of $8,210.30 to the EAL Firm, with a memo of "expense balance".

182.    Two properties of the receivership were sold in 2008.  First was the Andrews medical building, which sold in early May for $420,000.  That sale should resulted in a deposit of net proceeds of $169,000.  The ledger shows a rent payment on

Andrews of $1,500.00 on May 7, 2008; the only other deposits in May 2007 are $96.09 in accounts receivable on May 9, $500.00 of "miscellaneous income" on May 16, and $216.98 of "fee income: utilities" on May 23, 2007.

183.   The Lakemont property was sold in late September 2008 for $152,000.00, which should have netted approximately $40,000.00 to the estate.  There was only one deposit in September 2008: $500.00 for "auction of assets" on September 16.  In October 2008, there is a deposit of $17.64 of "miscellaneous income" on October 9, and a wire transfer of $39,220.34 on October 21 for "liquidation of assets", which may have been the proceeds from the sale of Lakemont.

184.   There are five deposits January-May totaling $7,700.00 which are either labeled as, or appear to be, rental income.  Few of the other 2008 deposits were unidentified:

    a)  "other income" of $2,421.92 on February 27;

    b)  a split deposit of $21,411.41 on March 10;

    c)  "miscellaneous income" of $43.58 on March 19;

    d)  Two separate deposits of $96.09 labeled "medical profession" on April 28 and May 7;

    e)  "miscellaneous income" of $500.00 on May 16;

    f)  "fee income: utilities" of $216.98 on May 23;

    g)  a split deposit of $40.73 on July 7;

h) a "fee income: utilities" of $76.26 on July 1;

i) "auction of assets" of $1,656.20 on August 20;

j) "auction of assets"of $500.00 on September 16; and

k) "miscellaneous income" of $39,220.34 on October 21.

185.   Judge Williams had ordered that the Receiver be reimbursed by BONY for fees and costs incurred in the setting aside of the foreclosure sale of Huntington. On August 26, 2008, the ledger reports a "fee income: professional deposit" of $9,000.00, followed by a payment of $9,000.00 to the EAL Firm.

186.   In addition to the $9,000.00 check to EAL in August, there were five more payments to EAL: $7,000.00 on January 22, $15,000.00 on March 28, $5,000.00 on May 6,  $40,000.00 on November 4, and $12,000.00 on December, a total of $88,000.00.

187.   It had been reported that Lambros had paid court reporter Griffin-Kennedy a $5,000.00 deposit for the transcript fees from the receivership account.  The ledger shows one payment of $38.75 to Griffin-Kennedy on October 15, 2007.  The May 6th payment of $5,000.00 to the EAL Firm is labeled "fee refund" with a memo of "Reimbursement for T…"  It appears that the EAL Firm paid Griffin-Kennedy from the firm account, and then reimbursed itself for $5,000.00.  There appears to be no reason for this transaction; the receivership account had a balance of $12,017.14 prior to the payment to the EAL Firm.

188.   There is no record of payment to the Internal Revenue Service for its lien on the Chua assets.

189.   The 2008 year-end receivership balance was $4,692.64 after the EAL Firm received $52,000.00 in November-December 2008.   During 2008, the Receiver deposited a total of $92,636.25 and paid the EAL Firm a total of $88,000.00,

190.   There are only ten entries for all of 2009: three deposits of "miscellaneous income" ($682.00 on January 13 and two separate deposits of $794.22 on January 20) and one of "fee income: settlement income" of $10,000 on October 13, which coincides with the date of the sale of 812 Mission Trace.  The Receiver made only six payments totaling $285.04, leaving the year-end 2009 balance at $16,611.00.

191.   By April 12, 2010, when the Receiver filed his Report and Accounting, he had made one deposit of "fee income: settlement income" of $2,511 on February 1, and three water bills totaling $160.03.  The balance in the account was $19,028.74.

192.   In his April 12, 2010 Report, the Receiver recommended that he be allowed to close Dr. Chua's IRA and deposit the funds in the receivership account; that the Court allow Greenwillow to be foreclosed on the condition that the Receiver be reimbursed                                                                                                 his "costs associated with the upkeep and maintenance of the property"; that he be allowed to dispose of patient billing files, Dr. Chua's junk mail and his personal property; that the Court deny the claim of Nancy Bailey; that the 2001 Highlander

be returned to Dr. Chua or held by the State pending final disposition of the RICO action, and that the Receiver be paid his fees and expenses and be discharged.  The Receiver noted that there "will be no funds available to pay any of [Dr. Chua's] creditors."

193.   On May 19, 2010, MERS/Chase filed a direct response to Lambros' request regarding the Greenwillow property.   It noted that it had offered $6,796.88 for reimbursement of upkeep and maintenance on Greenwillow to the Receiver in July 2009;  that Lambros had accepted the offer in August 2009; and that Lambros had not provided MERS/Chase with a release of the lien so that it could proceed with the foreclosure sale.  MERS/Chase requests that the Court consider the 2009 agreement and allow MERS/Chase to foreclose with a $6,796.88 payment to the Receiver.

194.   In June of 2010, DA Kelley was sworn in as a Judge of the Superior Court in the Brunswick Judicial Circuit.   The following month, ADA Johnson was appointed by then-Governor Sonny Perdue to serve as District Attorney for the Brunswick Judicial Circuit.

Judge Williams swore DA Johnson in.

195.   Sometime between May and October of 2010, Ekonomou and Lambros dissolved the EAL Firm and started a new firm called "The Lambros Firm, LLC."

At that time, they began billing under that firm name and both the Cisco and Chua receivership accounts made payment to the Lambros Firm.

196.    On October 10, 2010, Judge Williams issued an order directing the Receiver as he had requested regarding Dr. Chua's IRA and the disposal of patient files, junk mail and personal property.  The Court released the Greenwillow property subject to the reimbursement for "all costs" of upkeep and maintenance without reference to the agreed-upon amount of $6,796.88; and denied the claims of the "Late Nancy Bailey".  The Court refused to take the Receiver's recommendation that the Highlander be returned to Dr. Chua's family or to the State, ordering that it be sold per the Court's previous order to liquidate assets of the estate. Otherwise, she directed that the Receiver be paid and be discharged once he had complied with the Order.

197.    On January 5, 2011, a member of the Lambros Firm filed a motion against MERS/Chase, claiming that MERS/Chase had "failed and refused to pay" the $6,796.88, that the Receiver had incurred additional costs, and asking the Court to order payment of the agreed-upon amount and impose sanctions against MERS/Chase for the additional costs and expenses.  Lambros withdrew the motion on April 5, 2011.

**On appeal, the Supreme Court affirms felony murder and prescription counts of VGCSA, but reverses on the VGCSA count regarding the use of Greenwillow.**

198.   On May 31, 2011, the Supreme Court handed down its decision on Dr. Chua's appeal of his criminal case.   The Court affirmed his conviction on all counts, with one glaring exception affecting the RICO case:  the court found that the State had produced no evidence supporting the VGCSA "drug house" count. The Court noted that the State had only proven that Dr. Chua owned the house and that, on at least on the date of his suicide, Carter had used controlled substances there.  Finding that the State had submitted no evidence from which the jury conclude that Dr. Chua maintained Greenwillow for the purpose of using controlled substances.  The Court vacated the conviction of the VGCSA "drug house" count.

199.   The reversal of the conviction on the VGCSA "drug house" count removed any basis for the RICO seizure of Greenwillow and the four residential rental houses.

**Judge Williams resigns from the bench and DA Johnson hires Ekonomou as an ADA.**

200.   On November 9, 2011, the Georgia Judicial Qualifications Commission ("JQC") filed a Notice of Formal Proceedings against Judge Williams, charging her with various violations of the Code of Judicial Conduct ("CJC") and Georgia law,

all stemming from her actions as Judge of the Superior Court.  Many of the charges concerned behavior similar to that experienced by Dr. Chua in both his criminal and civil proceedings before her, including:

    a)  Refusing to recuse herself when her partiality could reasonably called into question;

    b)  Expressing bias in matters being heard in drug court;

    c)  Allowing her social or employment relationships to influence her judicial conduct or judgment in both civil and criminal matters;

    d)  Endorsing ADA Johnson for the office of District Attorney in April 2009;

    e)  Ordering *ex parte* consolidation of a criminal (Drug Court) and civil (modification of child support) case;

    f)  Imposing mandatory minimum bonds and minimum sentences;

    g)  Threatening litigants and their attorneys should they appeal their cases.

201.   On December 2, 2011, then-DA Johnson hired Ekonomou as an Assistant District Attorney.   They agreed that Ekonomou would work as a contract employee, from both his Atlanta and the Brunswick DA's office, and would be paid a flat fee of $5,500.00/month.  His fee increased every year; by 2016, he was being paid $8,000.00/month.  On information and belief, he is still serving as an ADA under DA Johnson, and is the highest paid ADA in the Brunswick Judicial Circuit.

202.   On December 15, 2011, the JQC issued its First Amended Notice of Formal Proceedings, adding additional charges.  In addition to violations of the Canons of the Judicial Code of Conduct, Judge Williams was charged with violations of O.C.G.A. § 45-11-4, which prohibited her from "using tyrannical partiality in the administration or under the color of [her] office" and O.C.G.A. § 16-10-20, which prohibited her from making material false statements.

203.   On December 17, 2011, Judge Williams resigned from the bench, effective January 2, 2012.  In exchange for her promise not to seek judicial office again, the JQC dropped the charges.

204.   Dr. Chua's RICO forfeiture case was re-assigned to Judge Anthony D. Harrison, who continued to grant every motion made by the Receiver, thereby continuing the Murderer Enterprise's goal of stripping Dr. Chua of all his assets.

**Cisco RICO forfeiture case concludes on January 31, 2013.**

205.   On January 31, 2013, the Cisco receivership ended, with a balance of $2,467,850.48 the receivership account.  Judge Harrison granted the motion of DA Johnson to direct the Receiver to pay one-half of the balance, or $1,233,925.24 to Camden County and to pay the other $1,233,925.24 to DA Johnson, to be divided equally between the Georgia Bureau of Investigation, the St. Marys Police Department, and the DA's office.

206.   The Murderer Enterprise profited hugely from the Cisco receivership.

**Dr. Chua files a Petition for Habeas Corpus Relief in 2012**

207.   In 2012, Dr. Chua retained attorney Stephen Reba ("Attorney Reba") and, on August 10, 2012, Attorney Reba filed a habeas corpus petition in Superior Court of Calhoun County, where he was at that time imprisoned.   The habeas petition alleged, among other things, that Judge Williams illegally presided over Dr. Chua's trial because of her expressed bias and prejudice and that she conducted the criminal proceeding in a manner that violated his constitutional rights.

**Chua's Counsel Discovers the Berry Memo in Discovery & makes ORA request**

208.   Attorney Reba, pursuant to an Open Records Request, reviewed the DA's files on July 3, 2012 and requested copies of various documents.   Those documents included copies of checks made out to Attorney Samuel by Chua supporters, emails between and among Chua supporters in the summer of 2007, and a handwritten letter from Chua to Nancy Bailey, thereby confirming that Bailey had worked with the Murderer Enterprise.

209.   On July 24, 2013, pursuant to a second Open Records Request, Attorney Reba again reviewed the DA's files in its Camden County office.   On that day, Attorney Reba discovered, for the first time, a six-page typed memorandum with recommendations for jury selection.   The memorandum was undated and unsigned, but directed the reader to contact the author at the phone number of Camden County Commissioner Steve Berry's office.   The memorandum gave

general advice regarding jury selection, for the most part focusing on jurors' relationships with Sheriff Smith, and then listed several jurors by juror number and name, with information regarding their support of Sheriff Smith.

210.   Particularly disturbing was Berry's advice to DA Kelley to "avoid blacks on the jury."

**Open Records Requests for the Berry Memo**

211.   Attorney Reba made a formal request for the Berry memo pursuant to the Open Records Act on December 23, 2013.  On December 26, 2013, he received a response from the Open Records Officer April Howard that the estimated cost for retrieval would be $56.64.  Attorney Reba faxed a response to Howard that the estimated charge was acceptable and asked her to locate the document.

212.   Acting on direction by the Murderer Enterprise, on January 3, 2014, ADA Rocky Bridges ("ADA Bridges") left Attorney Reba a voicemail, rescinding Howard's offer to locate the document, asserting that the document was attorney work product.  ADA Bridges confirmed that position by letter dated January 10, 2014, and in a meeting with Attorney Reba on February 28, 2014.

**Attorney Reba Files Open Records lawsuit; the Murderer Enterprise fights back**

213.   On May 9, 2014, Attorney Reba and co-counsel Mary Helen Moses ("Attorney Moses") filed a suit styled *Chua v. Johnson,* Civ. Act. No. 14V519 in Camden County Superior Court to obtain the Berry memo pursuant to the Open

Records Act.  The suit was originally assigned to Judge Harrison, who was presiding over the RICO forfeiture action.

214.   The Murderer Enterprise took every effort to avoid disclosure of the Berry memo.  ADA Ekonomou, whose law firm was still receiving fees from the receivership estate, answered the complaint by suggesting that Attorney Reba had planted the Berry memo in the DA's files.  He alleged that the "DA had no knowledge of the document" prior to the Open Records Request; notwithstanding, the Berry memo was exempt from disclosure as attorney work product.

215.   Despite the Complaint's request for an expedited hearing and Attorney Reba's subsequent requests to Judge Harrison's chambers, no hearing was scheduled.

216.   On August 7, 2014, Attorney Reba filed a first amended petition for a writ of habeas corpus, styled *Chua v. Holt,* Civ. Act. No. 13CV59673, in Bibb County Superior Court, as Dr. Chua was then confined in Central State Prison.  Hon. Verda M. Colvin ("Judge Colvin") was assigned to the case.  The amended petition was broader than the original petition; specifically, it focused on the Berry memo and its importance to the case.  Simultaneously Attorney Reba filed a Motion to Compel the Camden County DA's office to produce the Berry memo.

217.    On October 24, 2014, Judge Colvin issued an order denying the motion to compel, concluding that the appropriate way to obtain the Berry memo was by way of the Open Records litigation.

218.    Attorney Reba filed a formal written Request for Hearing in Camden County Superior Court dated November 14, 2014, and filed on November 18, 2014.

219.    On November 13, 2014, unbeknown to Attorney Reba, an Order of Recusal for all five of the superior court judges in the Brunswick Judicial Circuit was filed with the Camden County Clerk, with a request for appointment of a judge outside the Circuit to hear the matter.

220.    The following day, the Administrative Judge assigned the case to Senior Judge J. Richard Porter III ("Judge Porter"), of Grady County; that appointment was filed November 19, 2014.

221.     Attorney Reba and ADA Ekonomou exchanged numerous emails with Judge Porter regarding the need for an evidentiary hearing, and Attorney Reba filed a motion for summary judgment or, in the alternative, for evidentiary hearing on the origins of the Berry memo on January 9, 2015.  The basis for the summary judgment motion was that ADA Bridge's December 30, 2014 voicemail was not timely, as required by statute and *Juraysi v. City of Marietta,* 294 Ga. App. 6 (2008).

222.    ADA Ekonomou's February 12, 2015 response continued the Murderer Enterprise's attack on Attorney Reba, alleging that "[t]he document that is the

subject of this lawsuit was not among documents made available to Reba when he made his second inspection of the Chua files on July 24, 2013, and therefore the District Attorney's Office was not in a position to assert a claim of exemption from disclosure as to that document."   Attached was an affidavit from ADA Bridges averring that he had not seen the Berry memo in the files prior to December 2013. Ekonomou nonetheless argued that the Berry memo was exempt from disclosure because it was attorney work product.   He further argued that the Dr. Chua "is limited to seeking disclosure of that document in his habeas case and may not avail himself of the Open Records Act to obtain it."

223.   In Reply, Attorney Reba produced ADA Bridges' December 30 voicemail, which stated that he had in fact seen the Berry memo prior to December 30, and had informed Attorney Reba that it was attorney work product.  He also produced Judge Colvin's October 24, 2014 order which held that the mechanism for obtaining the document was not discovery in the habeas case, but via Open Records Request.

224.   Judge Porter determined that he would conduct an *in camera* review of the Berry memo, and ADA Ekonomou transmitted the memo by email.  On March 11, 2015, Judge Porter issued an Order denying Dr. Chua's motion, finding that the Berry memo was attorney work product not subject to disclosure, and dismissing the complaint with prejudice.

225.    Attorney Reba immediately informed ADA Ekonomou of his intent to appeal Judge Porter's Order in its Entirety, and asked that ADA Ekonomou file the Berry memo under seal so that it would be part of the record on appeal.  ADA Ekonomou refused to answer email inquiries on March 13 and March 20, 2015.  On March 30, Attorney Reba emailed Judge Porter, noting that the memo had not been filed under seal and asking if the court wanted a motion.  For the first time, ADA Ekonomou responded to Reba by email, arguing that the appellate court did not "need to see the document if the [trial] court made findings about its contents that were not clearly erroneous."  On March 31, 2015, Attorney Reba filed a Motion for Filing of Subject Document under Seal and Request for Expedited Decision, pointing out the standard on review of an Open Records Act case was not "clearly erroneous" but rather called for a *de novo* review, which the Court of Appeals could not accomplish without the document itself.  Because  the Notice of Appeal should be filed in a short time, the Clerk would be required to prepare the record at that time, and he would be required to pay the Clerk's bill for costs within 20 days, Attorney Reba asked that Judge Porter rule on the motion at his earliest convenience.  ADA Ekonomou emailed that he would like 30 days to reply to the motion "as permitted by law."

226.    On April 6, 2015, Attorney Reba filed the Notice of Appeal, asking that nothing be omitted from the record on appeal.

227.   On April 7, the Camden County Clerk delivered the index for the record on appeal, which did not include the Berry memo, and a bill for $103.00 for the costs of the appeal.  In order for supersedeas to attach, Attorney Reba was required to pay the bill within 20 days, and the record would be transmitted at that time.

228.   On April 6,  Judge Porter emailed counsel, noting that the court had the authority to shorten the response time to the motion and directing the attorneys to "look at seeing what can be done to fit the applicable time needed and let me know."

229.   Attorney Reba sent ADA Ekonomou emails on April 6, 7, 8, and 14, regarding the time for filing his response to the motion.  ADA Ekonomou refused to engage in discussions.   On April 20, Attorney Reba emailed Judge Porter informing him that ADA Ekonomou would not communicate his response time, and asking the court to direct ADA Ekonomou to respond so that the document could go up on appeal on April 27.  Ekonomou responded that "there is nothing urgent about this" and stated he would respond on April 30.  On April 27, Judge Porter emailed counsel that it was his expectation that Ekonomou would respond to the motion in sufficient time for him to rule.

230.   On April 28, Attorney Reba filed his communications with ADA Ekonomou and Judge Porter, and paid the Clerk's bill.  He received a record index and was told the record would be sent to the Court of Appeals on April 29, 2015.

231.   On April 30, 2015, ADA Ekonomou filed a response to the April 3 motion to have the document filed under seal, arguing that it should be denied. He even questioned the trial court's jurisdiction once the Notice of Appeal had been filed. Attorney Reba filed a Reply the following day.

232.   On May 4, 2015, Judge Porter issued an Order directing ADA Ekonomou to file the document under seal within three days, and ordered the Clerk to transmit a supplemental record on appeal within three days of the filing under seal.  The court directed that the supplemental record include ADA Ekonomou's response to the motion to file under seal; Dr. Chua's reply; the Berry memo filed under seal; and "this Order."

233.   It wasn't until May 13, 2015, that the Clerk was able to send the Berry memo to the Court of Appeals, after Judge Porter issued an order directing the Clerk to make one copy of the document under seal, return the original to its sealed state, and send the copy under seal to the Court of Appeals.

**While the DA's office fights the disclosure of the Berry Memo, The Receiver Files his Fifth Report and Accounting and Second Motion for Direction as to the Winddown of the Receivership Estate**

234.   On October 14, 2014, Lambros filed an Application for Direction; in response, Judge Harrison on January 5, 2015 ordered the Receiver to file up-to-date accounting, as well as the current value of Dr. Chua's IRA accounts and how the Receiver intended to apply the funds seized from those accounts.

80

235.    The Receiver Filed the Report on February 9, 2015.  He reported that the IRA account was closed and the funds deposited in the receivership account; that Greenwillow was foreclosed and Receiver was reimbursed for all costs of upkeep and maintenance; the Receiver disposed of the junk mail and personal property; the Receiver sold the 2001 Highlander and funds deposited in the Lambros Firm's IOLTA account; and Receiver paid the outstanding administrative fees and expenses "from the assets of the Receivership Estate."

236.    The Receiver reported the following assets under his control:

   a) $14,590.62 in the Receivership SunTrust Account;

   b) $3,516.46 in the Receiver's Receivership Estate's BB&T IOLTA bank account;

   c) Dr. Chua's e-trade individual IRA worth $42,756.43; and

   d) Dr. Chua's e-trade Custodian IRA worth $25,672.45.

Prior to this report, there had been no report of a Receivership Estate's IOLTA account, nor any e-trade IRA's.

237.    The Receiver reported that he paid expenses from the receivership SunTrust account through November 22, 2011.  The Receiver also held funds from the sale of the Tacoma truck in the Lambros Firm's IOLTA account.  The Receiver attached a schedule from each account to the Report.

238.   The Receiver recommended that (1) funds in etrade IRA accounts continue to be enjoined; (2) the Receiver be allowed to maintain patient billing files until after September 2016, and retain $1,295.00 in his IOLTA account to cover the costs associated with storage and disposal of the files; (3) that the Receiver be paid administrative fees of $2,483.07; (4) that the balance of funds held by Receiver after deductions made be placed into the registry of the Court.

239.   The "Accounting" ledgers for the receivership account and the "Noel Chua IOLTA" appeared to be word processing documents, as opposed to the computer-generated ledgers in the first four reports.   There were few identifications of transactions and no running balance.   The receivership account showed a balance of $21,086.25 on March 31, 2010, some two thousand more than the balance of $19,028.74 shown in the Fourth Report for April 12, 2010.   There were no deposits in 2010; the only payments were to the City of St. Marys, presumably utility bills (totaling $380.14), and one payment to the Lambros Firm for $10,000.00 on November 16.   The year-end balance was not reported, but should have been $10,706.11.

240.   In 2011, Lambros reported three deposits in 2011: $42,777.95 on March 9, labeled "Oppenheimer Funds"; $6,796.88 on April 12, apparently the Greenwillow reimbursement by MERS/Chase; and $44.10 labeled "City of St. Marys -deposit refund) on September 1; total 2011 deposits were $49,618.93.   There were six

payments to the City of St. Marys totaling $244.56, a payment of $4,898.18 to Cecily Hill labeled "reimbursement for upkeep of properties; two payments of "professional fees" to Clifton, Lipford, Hardison & Parker, P.C. ("CLH&P") totaling $809.30; a payment to the Osprey Cove HOA of $6,246.92; and two payments to the Lambros Firm totaling $33,481.36.

241.   The receivership account ledger shows an account balance of $14,590.62.

242.   The "Noel Chua IOLTA" ledger shows a beginning balance on March 30, 2011 of $6,445.00, identified as "proceeds from the sale of Tacoma."  No other deposits were shown.  One payment of $325.00 was made to CLH&P for "preparation of tax documents" on December 27, 2012, and one payment of $1,608.54 was made to the Lambros Firm for  "payment of expenses."  The remaining 18 payments – one of $60.00 on July 29, 2013, and seventeen of $55.00 made between September 5, 2013 and January 5, 2015 – were made to Hippo Storage.

243.   The "Noel Chua IOLTA" ledger shows an account balance of $3,516.46.

244.   On March 17, 2015, Judge Harrison issued an Order adopting all of the Receiver's recommendations *verbatim.*

245.   On July 28, 2015, Lambros wrote a letter to the Clerk of Camden Superior Court, including a check drawn on The Lambros Firm's IOLTA account for

$14,274.01 to be paid to the registry of the Court. This was the amount Dr. Chua recovered on September 20, 2017.

**The Court of Appeals Orders an Evidentiary Hearing on the Berry Memo, Dr. Chua moves to disqualify the DA's Office, and the parties settle with the disclosure of the memo.**

246. Recognizing that Judge Porter erred in failing to grant Dr. Chua an evidentiary hearing in his suit under the Open Records Act for the Berry memo, the Court of Appeals, on March 21, 2016, reversed and remanded the case to the trial court for an evidentiary hearing. *Chua v. Johnson*, 336 Ga. App. 298 (2016).

247. Upon remand, on May 2, 2016, Attorney Reba filed a Motion to Disqualify the District Attorney's Office as Defendant's Counsel in Evidentiary Hearing, outlining the series of misconduct by ADA Ekonomou and his office leading up to the Court of Appeals' reversal.

248. After more than two years of intentionally withholding the Berry memo, having come to a point where Berry would be subpoenaed and forced to testify, ADA Ekonomou agreed to "settle" the Open Records Act litigation and turn over the Berry memo.

**The August 8, 2017 Evidentiary Hearing on Dr. Chua's Habeas Corpus Action before Bibb County Superior Court Judge Colvin**

249. The exposé of the Murderer Enterprise's conspiracy and scheme came to a head at the August 8, 2017 hearing before Judge Verda Colvin.

250.    While the testimony from Don Samuel and the presentation of the Berry memo established the validity of Dr. Chua's prosecutorial misconduct *Batson* claim, DA Johnson's and ADA Ekonomou's testimony—and Judge Colvin's clear disdain for their testimony—stole the show.

251.    Despite having claimed the Berry memo was attorney work product for two years—meaning she had used it in anticipation of litigation in the trial of Dr. Chua—DA Johnson testified that she had not seen the document until it was discovered and requested by Attorney Reba in his open records review.

252.    Similarly, clearly fumbling over his inexplicable dual role as an assistant district attorney and lawyer in private practice, ADA Ekonomou attempted to invoke attorney-client privilege with DA Johnson when asked about their decision to categorize the Berry memo as work product.

253.    The hearing concluded with Judge Colvin scheduling another hearing where Berry would be forced to attend—because, despite being served with a subpoena in Georgia for the August 8, 2017 hearing, he failed to show.

**The Proposed "Global Settlement" of Dr. Chua's Habeas Petition and RICO Forfeiture Action Comes from Receiver Lambros**

254.    On August 22, 2017, Attorney Reba received a voicemail from Attorney Samuel who indicated that Receiver Lambros had called him and wanted to try to work something out in the Dr. Chua case.

255.    Accordingly, Attorney Reba called Lambros the same day.  Lambros offered to act as a "go-between" in resolving both the civil and criminal cases, stating that Dr. Chua had served enough time in jail.

256.    On August 23, 2017, Lambros called Attorney Reba and explained that DA Jackie and ADA Ekonomou were willing to vacate the murder conviction and allow Dr. Chua to plead guilty to involuntary manslaughter with a sentence of time already served.  He further explained that ADA Ekonomou would be contacting Attorney Reba soon with specifics.

257.    On August 25, 2017, ADA Ekonomou called Attorney Reba and laid out that Dr. Chua would plead guilty to involuntary manslaughter and VGCSA – keeping a dwelling place (a count and conviction that had been invalidated for insufficiency of evidence on direct appeal) and receive time served. ADA Ekonomou also expressly mentioned that the resolution would not occur if the press got wind of it. The resolution date was set for September 18, 2017 in the Glynn County Superior Court (sitting for Camden County Superior Court).

258.    On September 18, 2017, the parties met at the Glynn County Courthouse, and appeared before Judge Harrison, who normally sits in Camden County.  By consent motion, Dr. Chua's two-sentence Extraordinary Motion for New Trial was granted "in the interest of justice."  Separate orders granting the motion for each count of conviction were entered by Judge Harrison.

259.    The plea agreement, signed by ADA Ekonomou and Attorney Reba, provided that Dr. Chua would enter guilty pleas to involuntary manslaughter and the "dwelling house" VGCSA; that he would dismiss his habeas with prejudice; that he would not engage in the practice of medicine in the State of Georgia and would not seek licensure to do so; that he would not "enter, reside or be physically present" in any county in the Brunswick and Waycross Judicial Circuits; and that he would have no contact with the Carter family or any witness in the criminal proceeding.

260.    In open court, ADA Ekonomou and DA Johnson acknowledged that they had proposed the plea agreement because events in the habeas hearing on August 8, 2017 had "raised concerns" and left the DA's office "uncertain" as to the outcome of the habeas petition.  The DA's office thus recommended that Judge Harrison sentence Dr. Chua as provided in the plea agreement.

261.    As previously arranged, Dr. Chua also signed a Consent Agreement of Forfeiture drafted by the Murderer Enterprise, and signed by ADA Ekonomou. That settlement agreement, between Dr. Chua and  the State, provided that the State would release "all claims and interests it has or may have in any and all monies deposited by the Receiver into the registry of the Court and all monies in the Oppenheimer IRA account", but all other personal and real property seized by the Receiver was forfeited to the State.  Similar to the Plea Agreement, Dr. Chua

was enjoined from practicing medicine in Georgia and/or seeking licensure in Georgia and from "entering, residing, and/or being physically present" in the Brunswick and Waycross Judicial Circuits.  Dr. Chua agreed to dismiss the habeas action with prejudice and to have no contact with the victim's family or witnesses in the criminal proceeding.   The agreement also contained a mutual release, accord, satisfaction and settlement between the parties to the agreement.

262.   In fact, the Oppenheimer IRA account were seized by the Receiver and deposited into the receivership account in 2011; it was the funds in two etrade IRA's that were "still under injunction" in accordance with Judge Harrison's Order on March 17, 2015.

263.   In open court on September 18, 2019, Judge Harrison signed a Consent Order and Judgement of Forfeiture in which he adopted the provisions of the Consent Agreement.

264.   Following the Court proceeding described in paragraph 246, *supra,* Dr. Chua was transported to the Camden County Detention Center, where he was released.

265.   Dr. Chua has fully abided by all the terms of both Agreements since his release.

## COUNT 1

## 42 U.S.C. § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

266.   Dr. Chua adopts and incorporates by reference paragraphs 1-266 of this Complaint as if set forth in full.

267.   Defendants and other members of the Murderer Enterprise conspired to deprive Dr. Chua, among other things, of his rights of due process, liberty and property, by virtue of the actions complained of herein, entitling Dr. Chua to recovery for the damages caused by their unlawful seizure and disposal of his assets and other damages resulting from their obstruction of justice, in accordance with 42 U.S.C. § 1985.

## COUNT II

## 42 U.S.C. § 1988 ATTORNEYS' FEES

268.   Dr. Chua adopts and incorporates by reference paragraphs 1-268 of this Complaint as if set forth in full.

269.   Because Defendants and other members of the Murder Enterprise have violated Dr. Chua's rights protected by 42 U.S.C. § 1985, Dr. Chua is entitled to the award of attorneys' fees and expenses as provided by 42 U.S.C. § 1988.

   **WHEREFORE,** based upon the foregoing allegations and the evidence to be presented in this matter, Plaintiff Noel N. Chua, M.D. respectfully prays that judgement be entered against Defendants, and that:

(1) Plaintiff be granted a jury trial as to all issues subject to trial by jury;

(2) Plaintiff be awarded special, general, and consequential damages to be determined by a fair and impartial jury;

(3) Plaintiff be awarded punitive damages;

(4) Plaintiff be awarded reasonable attorneys' fees and costs of litigation; and

(5) Plaintiff be awarded such other and further relief as this Court deems just and proper.

Respectfully submitted, this 18th day of September, 2019.

/s/ Stephen M. Reba
Stephen M. Reba
Georgia Bar No. 532158
smr@rebalaw.com

**ATTORNEY FOR PLAINTIFF**

The Law Office of Stephen M. Reba, LLC
P. O. Box 1046
Decatur, Georgia  30031
(404) 850-7949 (phone)
(404) 935-5305 (fax)